**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-3258

GUNNISON COUNTY STOCKGROWERS' ASSOCIATION, INC., a Colorado Nonprofit Corporation; and
COLORADO CATTLEMEN'S ASSOCIATION, a Colorado Nonprofit Corporation,

    Plaintiffs,

v.

U.S. FISH AND WILDLIFE SERVICE;
MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife Service;
COLORADO DIVISION OF PARKS AND WILDLIFE;
JEFF DAVIS, in his official capacity as Director of Colorado Parks and Wildlife;
ERIC ODELL, in his official capacity as Wolf Conservation Program Manager for Colorado Division of Parks and Wildlife; and
COLORADO PARKS AND WILDLIFE COMMISSION,

    Defendants.

## VERIFIED COMPLAINT

1.     Plaintiffs, Gunnison County Stockgrowers' Association, Inc. ("GCSA") and Colorado Cattlemen's Association ("CCA"), by and through their undersigned attorneys, bring this action against the United States Fish and Wildlife Service ("FWS"); Martha Williams, in her official capacity as Director of FWS (collectively with FWS, "Federal Defendants"); the Colorado Division of Parks and Wildlife ("Division"); Jeff Davis, in his official capacity as Director of the Division; Eric Odell, in his official capacity as Wolf Conservation Program Manager; and the Colorado Parks and Wildlife Commission ("Commission" and collectively with Defendant Division, "CPW," and collectively with Defendants Division, Jeff Davis, and

1

Eric Odell, "State Defendants"). Plaintiffs seek declaratory and injunctive relief to enforce the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and prevent the unlawful release of gray wolves into Colorado.

2. Plaintiffs challenge the decision of FWS to renew the Cooperative Agreement entered into between FWS and CPW (the "Agreement") pursuant to section 6(c) of the Endangered Species Act ("ESA"), 15 U.S.C. § 1535(c), for the period of October 1, 2023 through September 30, 2024. Renewal of the agreement for this upcoming period was an approval of the Commission's plan to reintroduce and manage gray wolves and grants the Division the legal authority necessary to procure and import gray wolves, a highly controversial endangered species, into Colorado. Plaintiffs seek a declaratory judgment and a mandatory injunction requiring the Federal Defendants to comply with NEPA by preparing an environmental impact statement on the reintroduction of wolves in Colorado. Plaintiffs also seek an injunction to prohibit the State Defendants, or any qualified employee or agent thereof, from releasing any wolves into Colorado unless and until an adequate environmental impact statement has been prepared and the Agreement lawfully renewed for the upcoming period.

## PARTIES

3. Plaintiff GCSA is a Colorado nonprofit corporation comprised of over 100 members of the local ranching community in Gunnison and Saguache Counties, Colorado. The GCSA reflects the primary land use in the Gunnison River Basin and holds as one of its purposes the protection of range privileges and the interests of the stock raising industry in the Gunnison River Basin. GCSA and its members live in and around locations selected as potential wolf release sites and identified as having high ecological suitability for gray wolves. The

reintroduction of gray wolves in Colorado will cause significant adverse impacts to the properties, businesses, and other vested interests of GCSA and its members.

4. CCA, the oldest cattlemen's organization in the United States, founded in 1867, is incorporated under the laws of the State of Colorado and represents all segments of the beef supply chain. Its direct and indirect membership totals approximately 6,000 producers, individuals, and businesses. Additionally, 49 local, breed, and issue organizations across the state operate within the CCA structure. CCA's members own or lease approximately 70% of the state's private, state, and federal grazing lands, totaling more than 25 million acres. CCA members not only provide the majority of wildlife habitat on private lands, but preserve significant open space for public access.  CCA represents most of the livestock producers in the State of Colorado.  The reintroduction of gray wolves in Colorado will cause significant adverse impacts to the properties, businesses, and vested interests of CCA and its members..

5. Defendant FWS is a federal agency within the United States Department of Interior that has been delegated the responsibility to administer the ESA, including the authority to enter into and renew cooperative agreements with a state for the purpose of assisting an endangered and threatened fish or wildlife conservation program.

6. Defendant Martha Williams is the Director of FWS and is sued in her official capacity.

7. Defendant Division is a state agency within the Colorado Department of Natural Resources that is responsible for the reintroduction of gray wolves in Colorado, including, among other things, the procuring and releasing of individual wolves. C.R.S. § 33-2-105.8.

8. Defendant Jeff Davis is the Director of CPW and is sued in his official capacity.

9. Defendant Commission is a state agency within the Colorado Department of Natural Resources that developed Colorado Wolf Restoration and Management Plan ("Plan") and is responsible for the reintroduction of wolves, by, among other things, "[t]ak[ing] the steps necessary to begin reintroduction of gray wolves by December 31, 2023," and "[o]verse[ing] gray wolf restoration and management, including the distribution of state funds. . . ." C.R.S. § 33-2-105.8(2). The Commission is also responsible for issuing regulations and developing programs for the management of endangered species in Colorado and developed the Plan. *Id.* §§ 33-2-104, 33-2-105.

## JURISDICTION AND VENUE

10. This action arises under federal law, and specifically NEPA, 42 U.S.C. § 4321 *et seq.*, and is brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*; *see also Ross v. Fed. Highway Admin.*, 162 F.3d 1046, 1053 (10th Cir. 1998); *see also Zeppelin v. Fed. Highway Admin.*, 293 F.Supp.3d 1267, 1284 (D. Colo. 2017) (stating that a non-federal entity is subject to APA jurisdiction by "consent through participation in a federal process, consent through accepting federal money, or both").

11. This Court has jurisdiction over this action under 28 U.S.C. § 1331, which grants the district courts federal question jurisdiction, and 28 U.S.C. § 1361, which grants jurisdiction to the district courts over an action in mandamus to compel the performance of duties by federal officers and may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201 and 2202.

12. Venue is appropriate in this Court under 28 U.S.C. § 1391(e) because FWS is an agency of the United States with multiple offices in Colorado and Defendant Williams is an

employee or officer of the United States and all or a substantial part of the events giving rise to this action occurred within this judicial district. Specifically, review of CPW's request to renew the Agreement under challenge was conducted by a regional office of FWS located in Lakewood, Colorado. In addition, the Agreement is an agreement between FWS and CPW, an agency of the State of Colorado, and concerns exclusively the management of threatened and endangered species within Colorado, including the proposed reintroduction of gray wolves to the state. Plaintiffs and their members reside in this district.

## LEGAL FRAMEWORK

### The Endangered Species Act

13. The ESA makes it illegal for any person to "take" any endangered species without a permit or authorization. 16 U.S.C. § 1538(a)(1)(B). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

14. Under Section 6 of the ESA, the Secretary of the Interior "is authorized to enter into a cooperative agreement . . . with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species." 16 U.S.C. § 1535(c)(1).

15. To determine that a state's program for the conservation of endangered and threatened species is adequate and active, "the Secretary must find and annually thereafter reconfirm such finding," that the state has established "acceptable conservation programs, consistent with the purposes and policies of [the ESA], for all resident species of fish or wildlife

5

in the State which are deemed by the Secretary to be endangered or threatened, and has furnished a copy of such plan and program together with all pertinent details, information, and data requested to the Secretary." 16 U.S.C. § 1535(c)(1)(B).

16. A qualified employee or agent of a state conservation agency which is a party to a cooperative agreement with FWS entered into pursuant to section 6(c) of the ESA who is designated by the agency for such purposes, may, when acting in the course of their official duties, "take" an endangered species covered by that cooperative agreement in accordance with the cooperative agreement if it does not result in the death or permanent disabling of the specimen. 16 U.S.C. § 1535(g)(2)(A); 50 C.F.R. § 17.21(c)(5)(i).

17. FWS may designate a population of an endangered species as "experimental" if it will be released into a habitat that is outside of the species' current range. 16 U.S.C. § 1539(j). The individuals of an experimental population are then subject to a relaxed standard under the ESA, allowing agencies to implement management tools and regulations otherwise prohibited. *Id.* §§ 1539(j)(2)(C).

### The National Environmental Policy Act

18. NEPA, 42 U.S.C. §§ 4321 *et seq.*, was enacted to ensure fully informed decision making and to provide for public participation in such decision making. 40 C.F.R. § 1500.1(a). The Council on Environmental Quality ("CEQ") promulgates regulations implementing NEPA that are binding on all federal agencies. 40 C.F.R. § 1500.3(a). Agency actions taken pursuant to NEPA are reviewable by this Court under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 702, 704, 706.

19. NEPA requires an Environmental Impact Statement ("EIS") to be prepared for all "major Federal actions significantly affecting the quality of the human environment. . . ." 42 U.S.C. § 4332(2)(C). For proposed actions where the environmental effects are uncertain, the agency must prepare an Environmental Assessment. 40 C.F.R. § 1501.5.

20. Major federal action means "an activity or decision subject to Federal control and responsibility" that is discretionary and results in final agency action. 40 C.F.R. §§ 1508.1(q)(1)(ii), (iii). Major federal actions may include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies." 40 C.F.R. § 1508.1(q)(2). CEQ regulations provide that major federal actions "tend to fall within one of the following categories," and list as a category the "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities." 40 C.F.R. § 1508.1(q)(3)(iv).

21. A non-federal project may be a major federal action subject to the requirements of NEPA where a federal agency exercises "sufficient control and responsibility" over the project. 40 C.F.R. § 1508.1(q)(1)(vi).

22. Pursuant to CEQ regulations, 40 C.F.R. § 1507.3, the Department of the Interior ("DOI") has adopted regulations that establish procedures for itself and its constituent bureaus, including FWS, to use for compliance with NEPA and CEQ regulations implementing NEPA. 43 C.F.R. § 46.10(a). These DOI regulations state that "[a] bureau proposed action is subject to the procedural requirements of NEPA if it would cause effects on the human environment and is subject to bureau control and responsibility." 43 C.F.R. § 46.100(a) (internal citations omitted).

For the purposes of these regulations, "bureau" means "bureau, office, service, or survey with the Department of the Interior." *Id.* § 46.30.

23. Where required, an EIS must be prepared "before making a decision on whether to proceed with the proposed action." 43 C.F.R. § 46.400. An EIS "shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process. . . ." 40 C.F.R. § 1502.5.

24. An agency may adopt categorical exclusions for categories of proposed actions the agency has determined normally do not have a significant effect on the human environment and therefore do not require preparation of an EA or an EIS. 40 C.F.R. § 1501.4(a). Pursuant to CEQ regulations, 40 C.F.R. § 1507.3, DOI has adopted department-wide categorical exclusions that apply to all its bureaus, 43 C.F.R. § 46.210, and FWS has adopted additional categorical exclusions that apply to actions by that agency, DM Part 516 Ch. 8.

25. If a categorical exclusion covers an agency's proposed action, the agency must evaluate whether "extraordinary circumstances" exist such that the normally excluded action may have a significant environmental effect and the agency must prepare an EA or an EIS. 40 C.F.R. § 1501.4(b); 43 C.F.R. § 46.205(c)(1). DOI's department-wide procedures for evaluating whether extraordinary circumstances exist state that "extraordinary circumstances" exist for actions with "highly controversial environmental effects." 43 C.F.R. § 46.215(c).

26. Agency action must comply with NEPA if the action is "functionally equivalent" to issuing a permit authorizing activity that would otherwise be unlawful. *Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996) (finding that issuance of an ESA section 7 incidental take statement permitting the limited take of endangered species was "functionally equivalent" to

issuing a permit because it was a "prerequisite" for the states' activity, which would have otherwise been unlawful under the ESA, and was therefore a major federal action); *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 46 (D.C. Cir. 2015) (finding that incorporation of an ESA section 7 incidental take statement into a pipeline project's Clean Water Act verifications permitting the limited take of endangered species was the "functional equivalent" of a permit because it authorized activity otherwise unlawful under the ESA and was therefore a major federal action).

## The Administrative Procedure Act

27. "Because [NEPA] does not contain a private right of action for those seeking to enforce its procedural requirements, a plaintiff must rely on the Administrative Procedures Act (APA) as the basis for its actions. . . ." *Comm. to Save the Rio Hondo v. Lucero*, 102 F. 3d 445, 448 (10th Cir. 1996). Under the APA, a reviewing court will "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and "hold unlawful and set aside agency action" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D).

## GENERAL ALLEGATIONS

28. FWS entered into the Agreement with CPW (then known as the "Division of Wildlife") pursuant to section 6(c) of the ESA, 16 U.S.C. § 1535(c), in 1976, and has renewed the Agreement annually each year thereafter. A copy of the Agreement is attached hereto as **Exhibit A.**

29. Section 2(b) of the Agreement provides a limited waiver of the ESA's "take" prohibitions, authorizing a qualified employee or agent of CPW acting in the course of his official duties to "take any resident federally listed Endangered fish or wildlife for conservation purposes that are consistent with this Cooperative Agreement or any Project Agreement attached thereto." Agreement § 2(b). However, such take may not be "reasonably anticipated" to result in the death or permanent disabling of the specimen, the removal of the specimen from Colorado, the introduction of the specimen or its progeny to any area beyond the historical range of the species, or the holding of the specimen in captivity for more than 45 consecutive days. *Id.*

30. Section 5(a) of the Agreement requires CPW to annually request that the Agreement be renewed for the upcoming period, and submit with its request certain supporting documents, including a list of any substantial changes in the endangered and threatened wildlife conservation program since the date of the previous program submission.

31. Upon information and belief, FWS has never conducted a NEPA analysis prior to its decision to renew the Agreement.

32. In 2020, Colorado voters narrowly passed Proposition 114, codified at Section 33-2-105.8, C.R.S., requiring the Commission to "[d]evelop a plan to restore and manage gray wolves in Colorado" and "[t]ake the steps necessary to begin reintroductions of gray wolves by December 31, 2023," among other things. C.R.S. §§ 33-2-105.8(2)(a), (d).

33. The Division developed the Plan, which the Commission finalized and unanimously approved on May 3, 2023.

34. The Plan requires the Division to capture ten to fifteen wolves annually by trapping, darting, or net gunning them in a donor state, and transporting them in a crate by

vehicle or aircraft to western Colorado. These actions are prohibited by 16 U.S.C. § 1538(a)(1)(B) in any state in which the gray wolf is a federally listed engendered species, including Colorado.

35. The Plan includes the transfer of thirty to fifty wolves over a three-to-five-year period onto private and state-owned land in two geographic areas in Colorado beginning in 2023. The northern area encompasses an area along the I-70 corridor between Glenwood Springs and Vail and extends down the Roaring Fork Valley. The southern area encompasses an area along the Highway 50 corridor between Monarch Pass and Montrose and includes the Gunnison Basin.

36. CPW selected the release areas based on the ecological suitability and potential for human-wolf conflict of an area. CPW identified the Gunnison Basin as having high ecological suitability for gray wolves and as a possible wolf release location.

37. Gray wolves will disperse from their release locations and establish territories within any suitable habitat, including within the Gunnison Basin.

38. The Plan also involves lethal and non-lethal methods to address wolf conflicts, including intentionally causing discomfort or pain to individual wolves to alter their behavior.

39. FWS prepared an EIS for its proposed action to designate the gray wolf population in Colorado as a nonessential experimental population under section 10(j) of the ESA, 16 U.S.C. § 1539(j), due to the level of public interest in and the public controversy of the plan to reintroduce gray wolves to Colorado. USFWS, *FEIS, Colorado Gray Wolf 10(j) Rulemaking*, at 1-2, 4-3 (Sept. 2023). The Final EIS ("FEIS") and Draft Record of Decision were published September 15, 2023. The Final Record of Decision was published on November 8, 2023.

40. The FEIS prepared for the proposed 10(j) rule does not address the environmental consequences of reintroducing gray wolves in Colorado. FWS, *FEIS, Colorado Gray Wolf 10(j) Rulemaking*, at 1-5, 2-3, 2-4, 3-1 (Sept. 2023).

41. The final 10(j) rule does not on its own grant CPW sufficient protection from ESA liability to carry out gray wolf reintroduction pursuant to the Plan. *See* FWS, *Record of Decision*, *Establishment of a Nonessential Population of the Gray Wolf (*Canis lupus*) in Colorado*, at 3–7, Table 2-1 (Nov. 2023).

42. On October 17, 2023, David Klute, Species Conservation Unit Supervisor for CPW, sent FWS a letter requesting renewal of the Agreement for the period of October 1, 2023 through September 30, 2024, and attached the supporting documents required by Section 5(a) of the Agreement, including the list of substantial changes to the endangered and threatened wildlife conservation program since the date of the previous program submission.

43. The list of substantial changes to the program since the previous program submission included the planned reintroduction and management of gray wolves according to the Plan. The reintroduction and management of gray wolves was not part of any previous program submission.

44. In November 2023, FWS sent a letter to CPW informing CPW that, based on a review of the Plan and other supporting documents included with the request, FWS had determined that CPW's endangered and threatened wildlife conservation program, which for the upcoming period includes the reintroduction and management of gray wolves according to the Plan, was adequate and active and was approving the request to renew the Agreement for the period of October 1, 2023 through September 30, 2024. This letter was signed by Liisa Niva,

12

FWS Acting Field Office Supervisor, on October 19, 2023, Maria Boroja, FWS Assistant Regional Director Ecological Services, on November 16, 2023, and Anna Munoz, FWS Regional Director, on November 20, 2023.

45. But for FWS's approval of CPW's request to renew the Agreement, CPW and the Division would be unable to take the actions necessary to capture and transport wolves into Colorado without violating the ESA. 16 U.S.C. § 1538(a)(1)(B).

46. Upon information and belief, FWS did not conduct a NEPA analysis prior to authorizing renewal of the Agreement and approval of the wolf reintroduction.

47. The environmental impacts of the reintroduction of wolves in Colorado have not been the subject of any analysis under NEPA.

48. FWS prepared environmental impact statements for past wolf reintroduction efforts due to intense public controversy, including for the gray wolf reintroduction in Yellowstone National Park and central Idaho and for the Mexican wolf reintroduction in Arizona and New Mexico. 62 Fed. Reg. 2375, 2378 (1997). Like these past efforts, Colorado's wolf reintroduction efforts are highly controversial.

49. The presence of wolves negatively impacts the livestock and other industries by increasing costs and decreasing local spending, impacting many businesses and communities. Release of wolves in Colorado is likely to have other negative effects on the Plaintiffs and their members, including but not limited to impacts to GCSA's efforts to protect the federal listed Gunnison Sage Grouse, impacts to range management and the use of grazing allotments, impacts to other uses of public lands, and more.

50. The cost to implement mitigation measures to decrease conflicts between wolves and livestock can be significant while not providing permanent or guaranteed results. Such measures commonly include hiring additional range riders, deploying guard dogs, and installing barriers or electrified flagging, lights, and sound devices that may ward off wolves, among other things.

51. Wolves prey on livestock and cause stress to livestock that reduces their weight and decreases revenue for livestock producers.

52. The individual members of GCSA and CCA own and graze livestock in the Gunnison Basin and other areas identified by CPW in the Plan as having a high ecological suitability for wolf reintroduction. Plaintiffs' members will suffer specific negative effects due to the presence of wolves, including but not limited to predation, livestock stress, and the economic cost of wolf deterrence measures.

53. Wolves reduce ungulate populations, decreasing hunting opportunities and traffic to rural areas that rely on hunters and other wildlife related recreationists to power their economies.

54. Wolf release in Colorado is immanent. CPW announced on December 5, 2023 that it was sending employees to Oregon to procure wolves for transportation and release in Colorado, and that it intended to release wolves in Colorado on or before the end of 2023. If CPW is allowed to release wolves in Colorado before FWS complies with NEPA, this will irrevocably change the status quo and irreparably harm Plaintiffs and their members for the reasons stated herein.

55. GCSA and CCA actively participated in the development of the Plan and expressed their concerns regarding the scope of impacts associated with the potential release throughout that process. GCSA also sent letters to FWS, first on September 18, 2023 and again on October 5, 2023, requesting that FWS conduct NEPA review the agency's decision to renew the Agreement for the upcoming period, including the environmental impacts of wolf reintroduction.

## FIRST CLAIM FOR RELIEF
### (Renewal of the Agreement Violates NEPA)

56. Plaintiffs restate and incorporate the allegations in Paragraphs 1 through 55 in this First Claim for Relief.

57. Under the APA, a court must "compel agency action unlawfully withheld" and "set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

58. NEPA requires that an agency prepare an EIS prior to taking a major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 46.400.

59. The decision by FWS to renew the Agreement for the upcoming period of October 1, 2023 through September 30, 2024 was a discretionary final agency action that authorizes CPW to take actions that would otherwise constitute unlawful take of listed species including the gray wolf, and that are necessary for CPW to reintroduce the gray wolf to Colorado. These actions include, but are not limited to, capturing, handling, and transporting gray wolves. For this reason, the renewal functions as an approval of the highly controversial reintroduction of gray wolves in Colorado and permits and supports CPW's implementation of

15

the Plan and its take of wolves. CPW could not implement the Plan and reintroduce gray wolves in Colorado without approval by and support from FWS.

60. The decision by FWS to renew the Agreement for the upcoming period was unlike its decisions to renew the Agreement for any past period because of the impending wolf reintroduction. Upon information and belief, this decision marks the first time FWS has approved the exercise of authority under the Agreement, or under any Section 6 cooperative agreement, to reintroduce of a highly controversial listed species by a state and would enable the first reintroduction of wolves in the United States without FWS preparing an EIS, allowing FWS to evade its statutory obligations.

61. FWS cannot find that CPW's conservation programs for all resident endangered or threatened species is adequate without preparing an EIS considering the Plan's impacts on the human environment because of the highly controversial and consequential nature of reintroducing the gray wolf to Colorado. The process through which CPW created the Plan is not an adequate substitute for NEPA and does not fulfill its requirements or purpose. *Catron County Bd. of Com'rs, New Mexico v. U.S. Fish and Wildlife Serv.*, 75 F.3d 1429, 1437 (10th Cir. 1996) (finding that "[p]atrial fulfillment of NEPA's requirements . . . is not enough").

62. Renewing the Agreement for the upcoming period was a major federal action significantly affecting the quality of the human environment that will harm Plaintiffs and their members.

63. FWS has not prepared an environmental impact statement on the reintroduction of gray wolves in Colorado as required by law. Therefore, FWS must be compelled to prepare an

EIS and the decision to renew the Agreement for the upcoming period must be reversed and set aside. 5 U.S.C. §§ 706(1), (2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

a) Issue a declaratory judgment that the federal defendants have violated NEPA by renewing the Agreement for the period of October 1, 2023 through September 30, 2024 without preparing an environmental impact statement on the reintroduction of gray wolves in Colorado;

b) Require the Federal Defendants to comply with the provisions of NEPA and prepare an environmental impact statement on the reintroduction of gray wolves in Colorado;

c) Hold unlawful, reverse, and set aside the decision to renew the Agreement for the period of October 1, 2023 through September 30, 2024 until the Federal Defendants comply with NEPA;

d) Issue an injunction prohibiting the state defendants from releasing any gray wolves into Colorado unless and until the federal defendants lawfully renew the Agreement after complying with NEPA;

e) Allow Plaintiffs to recover the costs of this action, including attorneys' fees; and

f) Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 11th day of December, 2023.

                      TROUT RALEY

                      *s/ Michael A. Kopp*
                      Deborah L. Freeman, CO Reg. No. 12278
                      Michael A. Kopp, CO Reg. No. 43204
                      Lucas O'Brien, CO Reg. No. 58014
                      1120 Lincoln Street, Suite 1600
                      Denver, CO 80203
                      Telephone: 303-861-1963
                      dfreeman@troutlaw.com
                      mkopp@troutlaw.com
                      lobrien@troutlaw.com

                      ***Attorneys for Plaintiff, Gunnison County Stockgrowers' Association, Inc.***

                      WELBORN SULLIVAN
                      MECK & TOOLEY P.C.

                      *s/ James W. Sanderson*
                      James W. Sanderson, CO Reg. No. 2402
                      Anthony M. Roeber, CO Reg. No. 58176
                      1401 Lawrence Street, Suite 1800 Denver, CO   80202
                      jsanderson@wsmtlaw.com
                      roeber@wsmtlaw.com
                      Telephone: (303) 830-2500

                      ***Attorneys for Plaintiff, Colorado Cattlemen's Association***

## Verification

I, Andy Spann, declare as follows:

1. I am the president of plaintiff Gunnison County Stockgrowers' Association and a resident of the State of Colorado.
2. I have personal knowledge of my own activities and the activities and concerns of the Gunnison County Stockgrowers' Association and its members, including those set out in the foregoing Verified Complaint, and if called on to testify I would competently testify as to the matters stated herein.
3. I verify under penalty of perjury under the laws of the United States of America that the allegations in this Verified Complaint of which I have personal knowledge are true and correct to the best of my knowledge and belief. 28 U.S.C. § 1746.
4. Executed on this 11th day of December 2023.

_____
Andy Spann
President, Gunnison County Stockgrowers' Association, Inc.

## Verification

I, Robert Farnam, declare as follows:

1. I am the president of plaintiff Colorado Cattlemen's Association and a resident of the State of Colorado.
2. I have personal knowledge of my own activities and the activities and concerns of the Colorado Cattlemen's Association and its members, including those set out in the foregoing Verified Motion, and if called on to testify I would competently testify as to the matters stated herein.
3. I verify under penalty of perjury under the laws of the United States of America that the allegations in this Verified Motion of which I have personal knowledge are true and correct to the best of my knowledge and belief. 28 U.S.C. § 1746.
4. Executed on this 11th day of December 2023.

Robert Farnam
President, Colorado Cattlemen's Association

20