## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-3258

GUNNISON COUNTY STOCKGROWERS' ASSOCIATION, INC., a Colorado Nonprofit
Corporation; and
COLORADO CATTLEMEN'S ASSOCIATION, a Colorado Nonprofit Corporation,

      Plaintiffs,

v.

U.S. FISH AND WILDLIFE SERVICE;
MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife
Service;
COLORADO DIVISION OF PARKS AND WILDLIFE;
JEFF DAVIS, in his official capacity as Director of Colorado Parks and Wildlife;
ERIC ODELL, in his official capacity as Wolf Conservation Program Manager for Colorado
Division of Parks and Wildlife; and
COLORADO PARKS AND WILDLIFE COMMISSION,

      Defendants.

---

## PLAINTIFFS' VERIFIED MOTION FOR STAY OF AGENCY ACTION, PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT

---

### CERTIFICATION OF COMPLIANCE WITH DUTY TO CONFER AND NOTIFY

In compliance with D.C.Colo.L.Civ.R. 7.1 and 65.1, on December 11, 2023 counsel for

Plaintiff Gunnison County Stockgrowers' Association ("GCSA") spoke by telephone with

Colorado Assistant Attorney General Jake Matter, who represents the Colorado Division of

Parks and Wildlife and Colorado Parks and Wildlife Commission, regarding this Motion and the

underlying Complaint. In compliance with D.C.Colo.L.Civ.R. 65.1, counsel for GCSA also sent

Mr. Matter, via e-mail, copies of the Complaint and its attachments as well as a draft of this

1

Motion and its attachments, which constitute all documents filed in this Matter as of the filing of this motion. Counsel for GCSA described the nature of the Plaintiffs' claim in the Complaint and the relief requested in this Motion. Counsel for GCSA inquired whether Mr. Matter's clients would agree to voluntarily suspend wolf reintroduction efforts pending resolution of this litigation, or at least suspend them pending a hearing on Plaintiffs' request for a preliminary injunction as requested herein. Mr. Matter indicated that his clients would not agree to suspend any wolf reintroduction activities and that they oppose the relief requested herein.

On December 11, 2023, counsel for GCSA also spoke with a clerk at the Office of the United States Attorney for Colorado and requested to be placed in contact with an attorney representing the U.S. Fish and Wildlife Service ("FWS") and Martha Williams (collectively, the "Federal Defendants"). Counsel also sent the clerk, via email, copies of the complaint and draft motion. On December 12, 2023, counsel for plaintiff GCSA spoke with Mr. Brian Herman at the U.S. Department of Justice Energy and Natural Resources Division in Washington, D.C., who indicated that he has been assigned to this case to represent the Federal Defendants. Mr. Herman represented that he had received and reviewed the complaint and draft motion provided to the U.S. Attorney for Colorado. Counsel for GCSA inquired whether the Federal Defendants would be willing to suspend renewal of the Cooperative Agreement between FWS and the State of Colorado pending National Environmental Policy Act review of the impacts of wolf reintroduction. Mr. Herman stated they would not and that they oppose the relief requested herein.

2

Plaintiffs request disposition of the motion for a temporary restraining order immediately and further request that the Court set a hearing with respect to the motion for stay of agency action and preliminary injunction prior to the expiration of the prayed for restraining order.

## INTRODUCTION

Gunnison County Stockgrowers' Association, Inc. ("GCSA") and the Colorado Cattlemen's Association ("CCA") (collectively with GCSA, "Plaintiffs") respectfully move for this Court to (1) issue a preliminary injunction and temporary restraining order enjoining the State Defendants, Colorado Division of Parks and Wildlife ("Division"), the Colorado Parks and Wildlife Commission ("Commission" and collectively with Division, "CPW"), Jeff Davis, and Eric Odell, any agents or employees thereof, and all others in active concert or participation with the State Defendants from releasing or authorizing the release of any gray wolves into Colorado; and (2) stay the decision by the U.S. Fish and Wildlife Service ("FWS") to renew the Cooperative Agreement ("Agreement") entered into between CPW and FWS pursuant section 6(c) of the Endangered Species Act ("ESA"), 15 U.S.C. § 1535(c), pending resolution of this case.

Releasing wolves in Colorado is a controversial and irreversible action that will have significant impacts on wildlife and the way of life and livelihoods of rural Coloradans. The rush by the Defendants to release a controversial apex predator without preparing an EIS to understand the full impacts of this action is an irreversible action that will harm Plaintiffs and their members. If allowed to begin absent adequate NEPA analysis, wolf reintroduction and management in Colorado will cause numerous and wide-ranging impacts that will be discovered

3

only as they occur, rather than being understood, planned for, and possibly mitigated as a result of insights gained through the NEPA process. This will irreparably injure Plaintiffs, their members, and many others. It will also deny Plaintiffs and their members their procedural rights under NEPA and entrench FWS's non-NEPA-compliant decision. Once released, wolves will quickly disperse across the state, including into the Gunnison Basin, an area of high ecological suitability for the species. Their presence in the Gunnison Basin and elsewhere in Colorado will cause Plaintiffs and their members significant harm resulting from impacts to other species conservation efforts, livestock losses to predation and increased livestock stress, and high costs of conflict deterrence, among many other effects.

Despite explicit recognition of the highly controversial nature of the wolf reintroduction in Colorado, FWS unlawfully refused to prepare an EIS for its decision to approve renewal of the Agreement through September 30, 2024. Upon information and belief, FWS has prepared an EIS for all past wolf reintroduction efforts in the United States precisely because of the consequential and controversial nature of wolf reintroductions. Although the reintroduction effort is being carried out by the State Defendants, FWS has been heavily involved from the outset and the reintroduction is only possible and lawful because FWS approved it by renewal of the Agreement. It is fully within the responsibility and control of FWS to determine whether and on what conditions to renew the Agreement. Therefore, the FWS decision to renew the Agreement which allows the gray wolf reintroduction is subject to the requirements of NEPA, and CPW may not begin reintroduction unless and until FWS complies with NEPA.

## LEGAL BACKGROUND

### The Endangered Species Act

The ESA makes it illegal for any person to "take" any endangered species without a permit or authorization. 16 U.S.C. § 1538(a)(1)(B). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

Section 6 of the ESA authorizes the Secretary of the Interior "to enter into a cooperative agreement . . . with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species." 16 U.S.C. § 1535(c)(1). To determine that a state's program for the conservation of endangered and threatened species is adequate and active, "the Secretary must find and annually thereafter reconfirm such finding," that the state has established "acceptable conservation programs, consistent with the purposes and policies of [the ESA], for all resident species of fish or wildlife in the State which are deemed by the Secretary to be endangered or threatened, and has furnished a copy of such plan and program together with all pertinent details, information, and data requested to the Secretary." 16 U.S.C. § 1535(c)(1)(B). A qualified employee or agent of a state conservation agency which is a party to a cooperative agreement with FWS entered into pursuant to section 6(c) of the ESA who is designated by the agency for such purposes, may, when acting in the course of their official duties, "take" an endangered species covered by that cooperative agreement in accordance with the cooperative agreement if it does not result in the death or permanent disabling of the specimen. 16 U.S.C. § 1535(g)(2)(A); 50 C.F.R. § 17.21(c)(5)(i).

5

## The National Environmental Policy Act

NEPA, 42 U.S.C. §§ 4321 *et seq.*, was enacted to ensure fully informed decision making prior to approval and implementation of actions affecting the quality of the human environment and to provide for public participation in such decision making. 40 C.F.R. § 1500.1(a). The Council on Environmental Quality promulgates regulations implementing NEPA that are binding on all federal agencies. 40 C.F.R. § 1500.3(a). NEPA requires an Environmental Impact Statement ("EIS") to be prepared for all "major Federal actions significantly affecting the quality of the human environment. . . ." 42 U.S.C. § 4332(2)(C). For proposed actions where the environmental effects are uncertain, the agency must prepare an Environmental Assessment. 40 C.F.R. § 1501.5. Major federal action means "an activity or decision subject to Federal control and responsibility" that is discretionary and results in final agency action. 40 C.F.R. §§ 1508.1(q)(1)(ii), (iii). A non-federal project may be a major federal action subject to the requirements of NEPA where a federal agency exercises "sufficient control and responsibility" over the project. 40 C.F.R. § 1508.1(q)(1)(vi).

## The Administrative Procedure Act

"Because [NEPA] does not contain a private right of action for those seeking to enforce its procedural requirements, a plaintiff must rely on the Administrative Procedures Act (APA) as the basis for its actions. . . ." *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996). Under the APA, a reviewing court will "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and "hold unlawful and set aside agency action" if it

6

is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D).

## **Legal Standard**

Plaintiffs seek an injunction and temporary restraining order pursuant to Fed. R. Civ. P. 65 to prevent the State Defendants from releasing wolves pursuant to the improperly granted authority in the Agreement and a stay under Section 705 of the APA, 5 U.S.C. § 705, of FWS's improper renewal of the Agreement. The legal standard for relief under Rule 65 and Section 705 is the same, *Prairie Protection Colorado v. USDA APHIS Wildlife Servs.*, No. 19-CV-2537-WJM-KLM, 2019 WL 4751785, at *1 (D. Colo. Sept. 30, 2019) (citing *Winkler v. Andrus*, 614 F.2d 707, 709 (10th Cir. 1980)), and requires a showing that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm in the absence of the relief; (3) the harm the movant is likely to suffer absent the injunction and order outweighs any harm the injunction and order will impose on the defendant; and (4) the injunction and restraining order is not adverse to the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

The Tenth Circuit has historically disfavored three types of injunctions: injunctions that alter the status quo; mandatory, as opposed to prohibitory, injunctions; and injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016). Plaintiffs are not seeking a disfavored injunction. This injunction would maintain the status quo, is prohibitory, and would not afford

Plaintiffs all the relief they seek because it only prevents the State Defendants from altering the status quo of wolves in Colorado.

## FACTUAL BACKGROUND

Plaintiff GCSA is a Colorado nonprofit corporation comprised of over 100 members of the local ranching community in Gunnison and Saguache Counties, Colorado. The GCSA reflects the primary land use in the Gunnison River Basin and holds as one of its purposes the protection of range privileges and the interests of the stock raising industry in the Gunnison River Basin. GCSA and its members live in and around locations selected as potential wolf release sites and identified as having high ecological suitability for gray wolves.

GCSA has a long tradition of resource management in the Gunnison Basin, including the formation and development of the original language of the Taylor Grazing Act in the 1930s, significant participation in the passage of the Colorado Wilderness Bill of 1980, an active leadership role in the creation of the Bureau of Land Management's Resource Management Councils in the early 1990s, and an active and cooperative effort over the last two decades with CPW to protect and preserve the Gunnison sage grouse across the Gunnison Valley. The Gunnison sage grouse effort involved the expenditure of millions of dollars of private, county, and state funds and is currently backed up and protected by members of GCSA with FWS-approved Candidate Conservation Agreements and Assurances enrolled via Certificates of Inclusion covering thousands of acres of private land and the Candidate Conservation Agreement addressing grazing on federal lands in the Gunnison Basin. GCSA also actively participated in the development of Colorado's Wolf Restoration and Management Plan (the "Plan") and

expressed its concerns regarding the scope of impacts associated with the potential release throughout that process, including by sending two letters to FWS, first on September 18, 2023 and again on October 5, 2023, requesting that FWS conduct NEPA analysis of the agency's decision to renew the Agreement for the 2023–2024 period, including the environmental impacts of wolf reintroduction.

CCA, a Colorado nonprofit corporation, is the oldest cattlemen's organization in the United States, founded in 1867, and represents all segments of the beef supply chain. Its direct and indirect membership totals approximately 6,000 producers, individuals, and businesses. Additionally, 49 local, breed, and issue organizations across the state operate within the CCA structure. CCA's members own or lease approximately 70% of the state's private, state, and federal grazing lands, totaling more than 25 million acres. CCA members not only provide the majority of wildlife habitat on private lands, but preserve significant open space for public access. CCA represents most of the livestock producers in the State of Colorado. The reintroduction of gray wolves in Colorado will cause significant adverse impacts to the properties, businesses, and vested interests of CCA and its members. CCA actively participated in the development of the Plan and expressed its concerns regarding the scope of impacts associated with the potential release throughout that process,

In 1976, FWS and CPW (then known as the "Division of Wildlife") entered into the Agreement pursuant section 6(c) of the ESA, 15 U.S.C. § 1535(c). Among other things, the Agreement provides a limited waiver of the ESA's "take" prohibitions, authorizing a qualified employee or agent of CPW acting in the course of his official duties to "take any resident federally listed Endangered fish or wildlife for conservation purposes that are consistent with this

Cooperative Agreement or any Project Agreement attached thereto." Agreement § 2(b). However, such take may not be "reasonably anticipated" to result in the death or permanent disabling of the specimen, the removal of the specimen from Colorado, the introduction of the specimen or its progeny to any area beyond the historical range of the species, or the holding of the specimen in captivity for more than 45 consecutive days. *Id.*

The Agreement must be renewed annually. Section 5(a) of the Agreement requires CPW to annually request that the Agreement be renewed for the following year period, and submit with its request certain supporting documents, including a list of any substantial changes in the endangered and threatened wildlife conservation program since the date of the previous program submission. Upon information and belief, the Agreement has been renewed annually each year since 1976.

In 2020, Colorado voters narrowly passed Proposition 114, codified at Section 33-2-105.8, C.R.S. This statute requires the Commission to "[d]evelop a plan to restore and manage gray wolves in Colorado, using the best scientific data available" and "[t]ake the steps necessary to begin reintroductions of gray wolves by December 31, 2023," among other things. C.R.S. §§ 33-2-105.8(2)(a), (d). Accordingly, the Division developed the Plan, which the Commission finalized and unanimously approved on May 3, 2023. CPW, *Colorado Wolf Restoration and Management Plan*, at 3 (May 3, 2023) [hereinafter "*Plan*"]. The Plan requires the Division to capture ten to fifteen wolves annually by trapping, darting, or net gunning them in a donor state, and transporting them in a crate by vehicle or aircraft to western Colorado. *Id.* at 20. These actions are prohibited by 16 U.S.C. § 1538(a)(1)(B) in any state in which the gray wolf is a federally listed engendered species, including Colorado.

10

The Plan includes the transfer of thirty to fifty wolves over a three-to-five-year period onto private and state-owned land in two geographic areas. *Plan* at *Id.* The northern area encompasses an area along the I-70 corridor between Glenwood Springs and Vail and extends down the Roaring Fork Valley. *Id.* at 21. The southern area encompasses an area along the Highway 50 corridor between Monarch Pass and Montrose and includes the Gunnison Basin. *Id.* These areas were selected based on their ecological suitability and potential for human-wolf conflict. *Id.* at 21–22. CPW identified the Gunnison Basin as having high ecological suitability for gray wolves and as a possible wolf release location. *Id.* at 20. Regardless of the specific release location, in past reintroductions gray wolves have traveled up to 140 miles immediately after release in search of suitable habitat. *Id.* at 21.

FWS removed the gray wolf from the list of endangered and threatened wildlife on November 3, 2020. Removing the Gray Wolf (*Canis lupus*) From the List of Endangered and Threatened Wildlife, 85 Fed. Reg. 69778 (Nov. 3, 2020). However, that rule was vacated by a federal district court in California on February 10, 2022, returning the gray wolf to the list of endangered species subject to the full protection of the ESA. Reinstatement of Endangered Species Act Protections for the Gray Wolf (*Canis Lupus*) in Compliance with Court Order, 88 Fed. Reg. 75506, 75506 (Nov. 3, 2023).

Concurrent with CPW's development of the Plan and at CPW's request, FWS began a rulemaking process to designate Colorado's wolves as an experimental population ("10(j) rule") under section 10(j) of the ESA, 16 U.S.C. § 1539(j). *Plan* at 26. FWS prepared an EIS for this proposed designation action "due to the level of public interest . . . and potential for public controversy" over the Plan. USFWS, *FEIS, Colorado Gray Wolf 10(j) Rulemaking*, at 1-2, 4-3

11

(Sept. 2023). The Final EIS ("FEIS") and Draft Record of Decision were published September 15, 2023, *id.*, and the Final Record of Decision was published on November 8, 2023. FWS, *Record of Decision*, *Establishment of a Nonessential Experimental Population of the Gray Wolf (*Canis lupus*) in Colorado* (Nov. 2023). Importantly, the FEIS did not consider the specifics attendant to reintroduction of gray wolves in Colorado or the environmental consequences of such reintroduction. Rather, the FEIS was scoped narrowly to evaluate only alternate management frameworks on the assumption that wolves would be present, including the 10(j) management approach in contrast with no such approach. FWS, *FEIS, Colorado Gray Wolf 10(j) Rulemaking*, at 1-5, 2-3, 2-4, 3-1 (Sept. 2023).

The 10(j) rule relaxes some of the "take" prohibitions in response to the management activities proposed by CPW in the Plan. FWS, *Record of Decision*, *Establishment of a Nonessential Population of the Gray Wolf (*Canis lupus*) in Colorado*, at 3 (Nov. 2023). However, the final 10(j) rule does not on its own grant CPW sufficient protection from ESA liability to carry out gray wolf reintroduction pursuant to the Plan. *See id.*, at 3–7, Table 2-1.

In October 2023, CPW requested that the Agreement be renewed for the period of October 1, 2023 through September 30, 2024. *See* Exhibit A, attached. As required, CPW included with its request the list of substantial changes to the endangered and threatened wildlife conservation program since the date of the previous program submission, which for the renewal term included the reintroduction and management of gray wolves according to the Plan. *Id.* The reintroduction and management of gray wolves was not part of any previous program submission. In November 2023, FWS informed CPW that it had determined CPW's endangered and threatened wildlife conservation program, including the reintroduction and management of

gray wolves according to the Plan, was adequate and active and was therefore approving the request to renew the Agreement. *See* Exhibit B, attached.

Upon information and belief, FWS did not conduct a NEPA analysis prior to authorizing renewal of the Agreement and approval of the wolf reintroduction. The environmental impacts of the reintroduction of wolves in Colorado have not been the subject of any analysis under NEPA. However, FWS has prepared environmental impact statements for past wolf reintroduction efforts due to intense public controversy, including for the gray wolf reintroduction in Yellowstone National Park and central Idaho and for the Mexican wolf reintroduction in Arizona and New Mexico. 62 Fed. Reg. 2375, 2378 (1997).

Like these past efforts, Colorado's wolf reintroduction efforts are highly controversial. E.g., USFWS, *FEIS, Colorado Gray Wolf 10(j) Rulemaking*, at 1-2, 4-3 (Sept. 2023). In addition, the presence of wolves imposes significant costs on the livestock industry and the communities that depend on it. The cost to implement mitigation measures to decrease conflicts between wolves and livestock can be significant while not providing permanent or guaranteed results. *Plan*, at 10–11. Such measures commonly include hiring additional range riders, deploying guard dogs, and installing barriers or electrified flagging, lights, and sound devices that may ward off wolves, among other things. *Id.*

## ARGUMENT

Plaintiffs have shown that they are substantially likely to succeed on the merits, that they and their members will be irreparably harmed if CPW is allowed to release wolves into Colorado absent prior adequate environmental review pursuant to NEPA, that the harm Plaintiffs and their

members will suffer outweighs any harms Defendants are likely to suffer, and that the injunction would not be adverse to the public interest. The relief requested is therefore appropriate. This Court should also waive the requirement that Plaintiffs post a bond, or alternatively require only a nominal bond, because Plaintiffs are non-profit organizations seeking to vindicate the public interest by ensuring that the government agencies adhere to the law.

### A. Plaintiffs are likely to succeed on the merits.

To show likelihood of success on the merits, a movant "need not show a certainty of winning." *Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transp.*, 843 F.3d 886, 901 (10th Cir. 2016). Rather, the movant need only "present a prima facia case." *Id.* Here, Plaintiffs make a prima facie case in support of its NEPA claim.

NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "Major federal actions" include approval of projects by permit or regulatory decision. 40 C.F.R. § 1508.1(q)(3)(iv). A non-federal project may be a major federal action subject to the requirements of NEPA where a federal agency exercises "sufficient control and responsibility" over the activity. 40 C.F.R. § 1508.1(q)(1)(vi).

The Tenth Circuit has defined "major federal action" as "actions by the federal government . . . and nonfederal action with effects that may be major and which are potentially subject to Federal control and responsibility." *Ross v. Federal Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir. 1998) (internal quotation marks omitted). Put simply, "major federal action means that the federal government has actual power to control the project." *Id.* (internal quotation marks omitted). An agency has actual power to control a project such that NEPA is

14

required if agency approval is a prerequisite to the activity or if the agency can exert binding influence on the activity. *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988), *abrogated on other grounds by Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992) (citing *Davis v. Morton*, 469 F.2d 593, 596–98 (10th Cir. 1972) (finding sufficient federal control to require NEPA where federal agency approval was required for a non-federal activity despite the federal government having no legal interest in the activity and its involvement being limited to approval or disapproval of the action); *Scenic Rivers Ass'n v. Lynn*, 520 F.2d 240, 243–44 (10th Cir. 1975), *reversed on other grounds,* 426 U.S. 776 (1976) (finding sufficient federal control to require NEPA where the federal agency had the authority to "suspend a private action which would unquestionably affect the environment")).

Here, FWS failed to prepare an EIS for its renewal of the Agreement for the period of October 1, 2023 to September 30, 2024. That renewal confers on CPW the critical legal authority necessary to conduct the gray wolf reintroduction in Colorado. 16 U.S.C. § 1538(a)(1)(B). Renewal of the Agreement was a major federal action because it is a prerequisite to the planned reintroduction and FWS has authority to exercise binding influence on the reintroduction. Thus, FWS violated NEPA when it renewed the Agreement without preparing an EIS.

Absent the Agreement's renewal, CPW could not carry out its planned reintroduction of wolves in Colorado. The planned reintroduction necessarily includes actions that constitute the prohibited "take" of endangered species, including but not limited to capturing, handling, and transporting gray wolves from locations outside Colorado and into the state, and is therefore generally unlawful under the ESA. *Plan* at 20; 16 U.S.C. § 1532(19). The Agreement, however, provides a limited waiver of the ESA's "take" prohibitions, authorizing CPW and its agents to

"take any resident federally listed Endangered fish or wildlife for conservation purposes that are consistent with this Cooperative Agreement or any Project Agreement attached thereto." Agreement § 2(b); 16 U.S.C. § 1535(g)(2)(A).

CPW's program for the management of endangered species for the period of October 1, 2023 through September 30, 2024 includes CPW's newly created Wolf Management and Restoration Plan. Exhibit C, CPW, *Summary of conservation activities for fish and wildlife species included under the Oct. 1 2022- Sept. 30 2023 Cooperative Agreement between the U.S. Fish and Wildlife Service and Colorado Parks and Wildlife,* at 1 (October 2023). This Plan involves capturing, handling, and transporting gray wolves as necessary to implement the reintroduction. Therefore, the authority for CPW to reintroduce wolves in Colorado is anchored to the Agreement as renewed for the 2023–2024 period. Without the waiver of the ESA's take prohibition granted by the Agreement, CPW could not lawfully comply with federal law or C.R.S. § 33-2-105.8 and carry out its plan for the reintroduction of gray wolves.

FWS also has the authority to exert binding influence on CPW's plan to reintroduce and manage wolves. In making the decision to renew the Agreement for October 1, 2023 through September 30, 2024, FWS was required to review CPW's program for the conservation of endangered and threatened species, which, for the first time, included the Plan. FWS had to affirmatively determine that this program is "acceptable." 16 U.S.C. § 1535(c)(1)(B). Absent this finding of acceptability, CPW would have had until June 30th of the following year to make "appropriate changes" to its conservation programs, or else the Agreement would be terminated. Cooperative Agreement § 5(b). Thus, in deciding whether to renew the Agreement, FWS was "authorized, but not required to make a certain decision and therefore possessed total discretion

to act." *Nat. Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1255 (10th Cir. 2021) (internal quotation marks omitted). FWS possesses authority to reject CPW's program for managing endangered species and to require CPW to alter its program until FWS deems it acceptable. *See id.* (stating that NEPA is generally required where an agency has "discretion to impose terms and conditions" on its decision). FWS thus has the authority to exert binding influence on CPW's plan to reintroduce and manage wolves.

FWS's renewal of the Agreement for October 1, 2023 to September 30, 2024 approved the gray wolf reintroduction in Colorado and therefore was a major federal action. The reintroduction of wolves is highly consequential to the human environment and highly controversial. This triggers NEPA compliance and the need for preparation of an environmental analysis of the direct and indirect effects of this reintroduction prior to its implementation. FWS has responsibility, control, and actual power over the Agreement and the Plan, and CPW could not carry out the gray wolf reintroduction without renewal of the Agreement. Therefore, FWS violated NEPA when it acted to renew the Agreement for the October 1, 2023 to September 30, 2024 period without preparing an EIS.

**B.      Plaintiffs will suffer irreparable harm if CPW is allowed to implement the wolf reintroduction as planned.**

Plaintiffs and their members will suffer irreparable harm in the absence of this injunction. The "failure to undertake an EIS when required to do so constitutes procedural injury to those affected by the impacts of a project." *Save Strawberry Canyon v. Dep't of Energy*, 613 F.Supp.2d 1177, 1187 (N.D. Cal. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 (1992)). This type of harm has been found to be irreparable for purposes of supporting the

issuance of a preliminary injunction because the "bureaucratic momentum" created by allowing an agency's action to go forward absent NEPA review "will skew . . . the [agency] towards its original, non-NEPA compliant . . . decision" in any future analysis and decision-making. *Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F.Supp.2d 1213, 1219 (D. Colo. 2007); *see also Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir.1989) ("The difficulty of stopping a bureaucratic steam roller, once started . . . seems to us . . . a perfectly proper factor for a district court to take into account . . . on a motion for preliminary injunction."). The "irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).

Plaintiffs and their members will suffer irreparable procedural harm if the reintroduction of wolves commences without preparation of an EIS analyzing the impacts of such an action. Once CPW begins releasing wolves and managing them according to the Plan, the "bureaucratic momentum" will prevent Plaintiffs from ever fully realizing their procedural rights under NEPA. Any future decision making by FWS regarding the reintroduction and management of wolves will be skewed towards their past non-NEPA compliant decision.

Beyond the purely procedural harm, Plaintiffs will be irreparably harmed by the uninformed decision making from Federal Defendants' failure to comply with NEPA. *San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv.*, 657 F.Supp.2d 1233, 1241 (D. Colo. 2009) ("Plaintiffs' procedural interest in a proper NEPA analysis is likely to be irreparably harmed if [the agency] is permitted to go forward with the very actions that threaten the harm NEPA is intended to prevent, including uninformed decisionmaking."). "The injury of an

increased risk of harm due to an agency's uninformed decision is precisely the type of injury the National Environmental Policy Act was designed to prevent." *Comm. to Save the Rio Hondo*, 102 F.3d at 448–49. Plaintiffs and their members face increased risks of multiple harms due to the uninformed decision making of FWS with respect to the reintroduction and management of gray wolves.

As but one example, GCSA and its members have spent millions of dollars and countless hours on efforts to preserve and protect the federally listed Gunnison Sage Grouse ("Grouse") in the Gunnison Valley. *See* Affidavit of Greg Peterson, attached as Exhibit D; Affidavit of Hannah Cranor Kersting, attached as Exhibit E; Affidavit of William S. Trampe, attached as Exhibit F. Wolf reintroduction risks undermining these efforts if it proceeds without appropriate safeguards that consider wolf predation on Grouse relative to specific reintroduction siting locations and the effects on Grouse populations. The Plan includes no such safeguards or considerations. FWS's failure to consider in an EIS what the impacts to Grouse and Grouse conservation efforts may be greatly increases the risk of these injuries and prevents GCSA and its members from understanding and planning for these consequences and their effects on livestock production. It also deprives the agency and the public of the opportunity to understand those impacts and explore whether they can be mitigated.

FWS has similarly failed to afford detailed study and consideration of the wide range of other likely harms that Plaintiffs and their members will suffer. Among other harms, wolves will kill livestock; stress livestock they do not kill by harassing and injuring them, leading to reduced growth, reduced births, and more frequent need for veterinary care and other interventions; interfere with range management and the use of grazing allotments by impacting when, whether,

19

and how often grazing areas may be used; change the behavior of ungulates like elk in ways that increase conflicts and stress between these animals and livestock; and much more. *See id*. But rather than seeking to understand these impacts, CPW deliberately crafted its wolf plan not based on the best available scientific evidence but based on an explicitly stated desire to avoid NEPA compliance. *Plan* at 22 ("The plan does not currently contemplate releases on federal lands because CPW does not have the staffing or financial resources to undertake the required National Environmental Policy Act (NEPA) analysis prior to any federal land management agency authorizing releases on federal land."). FWS's failure to perform NEPA analysis here furthers this attempt to deliberately avoid analysis of the many impacts of the major action of wolf reintroduction, in violation of NEPA.

Once wolves are on the ground in Colorado, the status quo will be irrevocably altered, and it will be impossible for the agencies to consider and plan for likely impacts. Instead, any future NEPA analysis will be forced to incorporate the decision that has already been made. Plaintiffs and their members will bear the brunt of unforeseen impacts from this decision that may have been mitigated by alternative approaches the agency could consider. Plaintiffs' members will suffer irreparable injury to their businesses, their communities, and their efforts to be good stewards of the land on which they live and work if the release of wolves is not enjoined while the agency complies with NEPA.

### C.   The balance of harms weighs heavily in Plaintiffs' favor.

The harms cited above that Plaintiffs and their members face from allowing CPW to implement the Plan and release wolves in Colorado before proper environmental analysis strongly outweigh any harm that the Defendants may face from delaying the gray wolf

reintroduction. As discussed, Plaintiffs and their members would face numerous, significant, and wide-ranging harms from wolf reintroduction, harms that are only increased due to the agency's failure to comply with NEPA. *See Comm. to Save the Rio Hondo*, 102 F.3d at 448–49.

In comparison, neither the Federal nor State Defendants likely would suffer *any* harm from delaying reintroduction, as the injunction would only preserve the status quo. Delaying the reintroduction for a short period by issuing a temporary restraining order preventing the State Defendants from reintroducing wolves pending a hearing on the Plaintiffs' request for a preliminary injunction will not significantly interfere with reintroduction efforts. Entry of a preliminary injunction and stay of agency action to allow FWS to conduct an environmental review of the Plan also will not harm any of the Defendants because it merely will preserve the status quo and allow the agencies to comply with NEPA.

Nor would the relief requested herein place the State Defendants at risk of violating the state statutory requirement that the Commission "[t]ake the steps necessary to begin reintroduction of gray wolves by December 31, 2023." C.R.S. § 33-2-105.8(2)(d). Notwithstanding entry of a temporary restraining order and injunction here, the Commission has already taken significant steps towards reintroduction, including formulating a wolf reintroduction plan, conducting extensive outreach to and coordination with wolf "donor" states, and the like. The Commission is in compliance with Proposition 114's December 31, 2023 deadline already and will be free to continue to take steps to prepare for reintroduction even if the Court grants the Plaintiffs the relief requested herein, so long as such efforts do not involve the actual release of wolves. In fact, an injunction will actually help the Commission fulfill its obligations under the statute to use "the best scientific data available" in creating its gray wolf

21

restoration and management plan. C.R.S. § 33-2-105.8(2)(a). Thus, the balance of harms weighs heavily in Plaintiffs' favor.

**D.      The public interest favors granting an injunction.**

The public interest strongly favors granting this preliminary injunction. "The public has an undeniable interest in the [agency's] compliance with NEPA's environmental review requirements and the informed decision-making that NEPA is designed to promote." *Colorado Wild*, 523 F.Supp.2d at 1223. Indeed, there is public interest in the "careful consideration of environmental impacts before major federal projects go forward," and courts have found that "suspending such projects until that consideration occurs comports with the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (internal quotation marks omitted). The Tenth Circuit has "consistently identified the strong public interest in the enforcement of NEPA." *Coal. of Concerned Citizens*, 843 F.3d at 915. Because Plaintiffs are seeking this injunction to delay implementation of a project that cannot take place but for federal authorization and approval and to require compliance with NEPA, the Plaintiffs' requested relief is in the public interest.

In addition, the highly controversial nature of this action further supports the public's interest in its delay to ensure adequate NEPA analysis. FWS has prepared EIS's for past wolf reintroduction efforts due to the intense public interest in and controversy surrounding the species. E.g., 62 Fed. Reg. 2375, 2378 (1997).[1] Like these past efforts, Colorado's wolf reintroduction efforts are highly controversial and will be exceedingly impactful. This

---

[1] These efforts include the gray wolf reintroduction in Yellowstone National Park and central Idaho and for the Mexican wolf reintroduction in Arizona and New Mexico.

reintroduction deserves analysis, disclosure and thorough consideration pursuant to NEPA. Both the Federal and State Defendants have acknowledged this controversy. *Plan* at 8 (stating that "wolf management is likely to remain as complex as it is controversial"); 10j Rule FEIS at 1-2 (stating that an EIS was prepared for the 10j rule "due to the level of public interest in the State Plan to reintroduce gray wolves to Colorado and the potential for public controversy"). Despite this, CPW took deliberate action to craft the Plan in such a way as to attempt to avoid NEPA analysis. *Plan* at 22 (acknowledging CPW avoided releases on federal lands to avoid NEPA compliance). Allowing the Defendants to avoid their statutory obligations here would be contrary to the letter and intent of NEPA and would provide these and other agencies a court-approved roadmap to bypass NEPA compliance for future major federal actions, causing further harm to the public interest.

### E.    The Court should impose no bond or only a nominal bond.

Finally, if this Court enters a temporary restraining order or preliminary injunction, Plaintiffs request that the Court waive the bond requirement or, alternatively, impose no bond or only a nominal bond under the public interest exception to Rule 65(c).

Although Rule 65(c) requires a security to be posted in conjunction with a preliminary injunction, "the trial judge has wide discretion in the matter of requiring security" and under some circumstances, "no bond is necessary." *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964). The Tenth Circuit and its district courts routinely hold that a substantial bond is not required from litigants who, like Plaintiffs here, seek to enforce environmental laws to protect the public interest. *E.g., Colorado Wild*, 523 F.Supp.2d at 1230–31. This specifically includes enforcement of NEPA: "[W]here a party is seeking to vindicate the

public interest served by NEPA, a minimal bond amount should be considered." *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016).

Here, Plaintiffs are two non-profit organizations seeking to enforce the requirements of NEPA to protect their rights and interests and those of their members and to advance the public's interest in informed environmental decision making. A bond order that exposes GCSA or CCA to substantial financial liability would effectively preclude their ability to enforce NEPA. Such a result would harm Plaintiffs and their members and would be contrary to the public interest.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for a Stay of Agency Action, Preliminary Injunction and Temporary Restraining Order. We respectfully request that the Court grant this Motion and Order.

Respectfully submitted this 12th day of December 2023.

TROUT RALEY

*s/ Lucas O'Brien*
Deborah L. Freeman, CO Reg. No. 12278
Michael A. Kopp, CO Reg. No. 43204
Lucas O'Brien, CO Reg. No. 58014
1120 Lincoln Street, Suite 1600
Denver, CO 80203
Telephone: 303-861-1963
dfreeman@troutlaw.com
mkopp@troutlaw.com
lobrien@troutlaw.com

**Attorneys for Plaintiff, Gunnison County Stockgrowers' Association, Inc.**

WELBORN SULLIVAN
MECK & TOOLEY P.C.

*s/ Michael A. Kopp for James W. Sanderson*
James W. Sanderson, CO Reg. No. 2402
Anthony M. Roeber, CO Reg. No. 58176
1401 Lawrence Street, Suite 1800
Denver, CO   80202
jsanderson@wsmtlaw.com
aroeber@wsmtlaw.com
Telephone: (303) 830-2500

**Attorneys for Plaintiff, Colorado Cattlemen's Association**

**Verification**

I, Andy Spann, declare as follows:

1. I am the president of plaintiff Gunnison County Stockgrowers' Association and a resident of the State of Colorado.

2. I have personal knowledge of my own activities and the activities and concerns of the Gunnison County Stockgrowers' Association and its members, including those set out in the foregoing Verified Motion, and if called on to testify I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the allegations in this Verified Motion of which I have personal knowledge are true and correct to the best of my knowledge and belief. 28 U.S.C. § 1746.

4. Executed on this 11th day of December 2023.

Andy Spann
President, Gunnison County Stockgrowers' Association, Inc.

## Verification

I, Robert Farnam, declare as follows:

1. I am the president of plaintiff Colorado Cattlemen's Association and a resident of the State of Colorado.

2. I have personal knowledge of my own activities and the activities and concerns of the Colorado Cattlemen's Association and its members, including those set out in the foregoing Verified Motion, and if called on to testify I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the allegations in this Verified Motion of which I have personal knowledge are true and correct to the best of my knowledge and belief. 28 U.S.C. § 1746.

4. Executed on this 11th day of December 2023.

Robert Farnam

President, Colorado Cattlemen's Association