# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| GUNNISON COUNTY STOCKGROWERS' ASSOCIATION, INC., et al., *Petitioners*, v. U.S. FISH AND WILDLIFE SERVICE, et al., *Respondents*, v. CENTER FOR BIOLOGICAL DIVERSITY, HUMANE SOCIETY OF THE UNITED STATES, WESTERN WATERSHEDS PROJECT, and WILDEARTH GUARDIANS, *Applicant Respondent– Intervenors*. | Civil Action No. 1:23-cv-03258-RMR |

**[PROPOSED] ORDER DENYING PETITIONERS' MOTION FOR INJUNCTIVE RELIEF**

## ORDER

Before the Court is a motion to stay, enjoin, and restrain agency action filed by Petitioners Gunnison County Stockgrowers' Association and Colorado Cattlemen's Association. ECF 5. The matter has been briefed and heard and is ripe for review. For the reasons that follow, Petitioners' motion is DENIED.

## I.   BACKGROUND

In November 2020, Colorado voters approved Proposition 114, a ballot measure requiring Colorado Parks and Wildlife ("CPW") to restore gray wolves to the state. The measure, codified at Colo. Rev. Stat. § 33-2-105.8, recognized that "wolves were an essential part of the wild habitat of Colorado" before their extermination, and that, once restored, "gray wolves will help restore a critical balance in nature." *Id.* § 33-2-105.8(1). The measure called for the CPW Commission, an independent rulemaking body, to "[d]evelop a plan to restore and manage gray wolves in Colorado, using the best scientific data available," and to begin releases of gray wolves "by December 31, 2023." *Id.* § 33-2-105.8(2). The measure also calls for reintroduction to "be designed to resolve conflicts with persons engaged in ranching and farming in this state." *Id.* § 33-2-105.8(1)(d).

To "facilitate [CPW's] planned reintroduction of gray wolves," the U.S. Fish and Wildlife Service developed a rule under Section 10(j) of the Endangered Species Act ("ESA") aimed at providing management "flexibility." 88 Fed. Reg. 77,014, 77,021 (Nov. 8, 2023) ("10(j) Rule"). The 10(j) Rule designated gray wolves in Colorado as a "nonessential experimental population," which allows the Service and CPW to engage in

1

activities that would otherwise be considered unlawful "take" under the ESA. *See id.* at 77,020–21.  Those activities include many associated with capture, transport, and release of wolves, as well as other management activities.  *See* 16 U.S.C. § 1532(19) ("The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.").

      To assess the environmental effects of CPW's plan and the 10(j) Rule, the Service drafted an analysis under the National Environmental Policy Act ("NEPA"). The Service's NEPA process involved extensive public involvement: the agency conducted a public scoping process—to identify the important issues for its analysis—from July 21, 2022 to August 22, 2022, followed by a public- and peer-review comment process in early 2023, and issuance of a proposed rule and additional public comment on February 17, 2023. *Id.* at 77,034. The Service then issued its Final Environmental Impact Statement for the 10(j) Rule ("10(j) FEIS") in September 2023. *See* U.S. Fish & Wildlife Serv., Final Environmental Impact Statement - Colorado gray wolf 10(j) (Sept. 2023).[1]

      On December 11, 2023—over 3 years after the ballot measure passed, and just weeks before the statutory deadline for Colorado to begin wolf releases—Petitioners filed this action. ECF 1. They allege that Respondents violated NEPA when they renewed a Cooperative Agreement issued under Section 6 of the ESA without conducting an environmental review of that action. *Id.* Six nonprofit organizations with deep interest in Colorado's wolf restoration effort promptly moved to intervene in this suit. ECFs 14, 18, 22.

---

[1] https://fws.gov/media/final-environmental-impact-statement-colorado-gray-wolf-10j.

On December 12, 2023, Petitioners filed the motion for injunctive relief now before the Court. ECF 5 ("TRO Mot."). The parties briefed the motion, and the Court held an evidentiary hearing and heard argument on December 14, 2023.

## II.   STANDARD OF REVIEW

The bar for granting immediate injunctive relief is high. "A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (quoting *Free the Nipple—Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019)). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)).

## III.   ANALYSIS

Petitioners have not demonstrated that they are entitled to the extraordinary remedy of preliminary injunctive relief. To succeed on their motion, Petitioners must show (1) a likelihood of success on the merits; (2) a likelihood that they will suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in their favor; and (4) that the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Additionally, any relief granted in a preliminary injunction must be "of the same character as that which may be finally granted." *Stouffer v. Eulberg*, No. 09-cv-00320, 2010 WL 567998, at *2 (W.D. Okla. Feb. 11, 2010) (citing

*De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)). Petitioners here have failed to meet their burden.

Before proceeding through these factors, the Court notes that this is not the first time a court in the Tenth Circuit has evaluated a motion for injunctive relief from livestock groups, predicated on allegations of NEPA violations, to prevent reintroduction of wolves under a 10(j) rule. *See Coal. of Arizona/N.M. Cntys. for Stable Econ. Growth v. U.S. Fish & Wildlife Serv.*, No. 03-cv-00508, 2004 WL 7337667, at *22 (D.N.M. July 6, 2004). In *Coalition*, the court determined that injunctive relief was unwarranted and denied the livestock groups' motion—a conclusion the Court finds instructive here.

### A. Petitioners are unlikely to succeed on the merits.

Petitioners are unlikely to succeed on the merits of their claim for two reasons. First, the court cannot grant the relief sought here—as a final remedy, much less a preliminary one—because permits that are not challenged here (and thus beyond the Court's purview) independently authorize wolf releases. Second, the harmless error rule applies to Petitioners' NEPA claims because the Service's 10(j) FEIS evaluated the very environmental effects that Petitioners claim were ignored.

#### 1. The Court lacks power to grant the relief sought.

Petitioners are unlikely to succeed on the merits of their case because the Court lacks authority to grant the relief prayed for in the complaint: "prohibiting the state defendants from releasing any gray wolves into Colorado." ECF 1. Even if the Court held for Petitioners upon final adjudication on the merits, it could, at most, enjoin gray wolf capture and release activities conducted *pursuant to the Cooperative Agreement*.

4

But the Court lacks authority to enjoin wolf releases that may be conducted pursuant to *other* authorities not challenged here. Because the Court cannot grant the relief requested even if Petitioners prevail, it will not grant such relief now.

As the Tenth Circuit has held, a movant for injunctive relief must establish a meaningful "relationship" between the action sought to be enjoined and "the conduct asserted in the complaint." *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (affirming denial of injunction). This rule reflects the principle that "[a] court's equitable power lies only over the merits of the case or controversy before it." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015). So, "[w]hen a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction." *Id.*; *see also, e.g.*, *De Beers*, 325 U.S. at 220 (holding that a court may not enjoin activities "outside the issues in the suit.").

This limitation applies in full force to preliminary injunctive relief, which must be "of the same character as that which may be finally granted." *Stouffer*, 2010 WL 567998, at *2; *see also Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181, 1185 (10th Cir. 1975) (explaining there must be "a relation between temporary and permanent relief"). Accordingly, courts in the Tenth Circuit commonly deny preliminary injunctive relief that does not bear a suitably close relationship to the claims pled. *E.g.*, *id.*; *Robledo-Valdez v. Colorado Dep't of Corr.*, No. 21-cv-03491, 2022 WL 18356140, at *2 (D. Colo. June 13, 2022); *Lystn, LLC v. FDA*, No. 19-cv-01943, 2019 WL 6038072, at *1 (D. Colo. Nov. 14, 2019); *Zibalstar, L.C. v. Conte*, No. 17-cv-00563, 2017 WL 2589291, at *3–4 (D. Utah June 14, 2017); *KSQ Architects, P.C. v. Studzinski*, No. 16-cv-00167, 2016 WL

5

9223840, at *2 (N.D. Okla. July 27, 2016); *Means v. Lambert*, No. 06-cv-01137, 2008 WL 483606, at *1 (W.D. Okla. Feb. 20, 2008); *McCormick v. City of Lawrence, KS*, No. 02-cv-02135, 2002 WL 31385811, at *4 (D. Kan. Oct. 9, 2002). These cases illustrate that issues, parties, and actions beyond the case or controversy presented in the complaint are beyond the Court's purview, including with respect to injunctive relief.

Petitioners here seek to enjoin activity beyond their single claim pled, which challenges the Cooperative Agreement and nothing more. ECF 1. The relief sought is much broader: preventing Respondents from "releasing or authorizing the release of any gray wolves into Colorado," full stop. TRO Mot. 3. To justify that extraordinary request, Petitioners claim that, "[a]bsent the [Cooperative] Agreement's renewal, CPW could not carry out its planned reintroduction of wolves in Colorado" because it is otherwise prohibited from "capturing, handling, and transporting" wolves. TRO Mot. 15.

The Court disagrees. The Service's 10(j) Rule, which Petitioners do not challenge here, independently authorizes reintroduction activities. By statute, the basic purpose of rules issued under ESA Section 10(j) is to "authorize the release (and the related transportation)" of an endangered species if doing so "will further the conservation of such species." 16 U.S.C. § 1539(j)(2)(A). And the 10(j) Rule here carries out this purpose by expressly authorizing Colorado to capture and release gray wolves into Colorado: "When acting in the course of official duties, any employee of the Service or *a designated agent* may take a wolf, when necessary, in regard to *the release*, tracking, monitoring, recapture, and management of the [nonessential experimental population]." 88 Fed. Reg. 77,014, 77,038 (Nov. 8, 2023) (emphases added). The 10(j) Rule explains

that Colorado may become a "designated agent" and gain "authority to implement" the 10(j) Rule by undertaking a "Memorandum of Agreement" process. *Id.* at 77,038–39.

Colorado has completed that process and is now a designated agent. ECF 19-1. Any doubt over the applicability of the 10(j) Rule and MOA to Colorado's release activities is put to bed by the unequivocal authorizing language in the MOA itself:

> This MOA implements the Colorado wolf 10(j) rule. The Service authorized the State of Colorado, through CPW, *to release and establish gray wolves in Colorado* as an experimental population under section 10(j), subject to Service oversight, in accordance with the Colorado gray wolf 10(j) rule.

ECF 19-1 at 3. Thus, the 10(j) Rule and associated MOA, which Petitioners do not challenge, provide independent authority for Colorado to release wolves.

At least one other permit also independently authorizes Colorado's planned release activities. Under authority of Section 10(a)(1)(A) of the ESA, 16 U.S.C. § 1539(a)(1)(A), the Service issued a permit to Scott Becker, the agency's Region 6 Wolf Coordinator. ECF 22-1 at 5–13 (Movant-Resp.-Intervs. Ctr. for Bio. Diversity, et al. App'x Supp. Mot. Interv. 005–13). That permit authorizes Mr. Becker to "[c]apture, handle, anesthetize, collar, track, tag, transport, relocate, and collect biological samples" from gray wolves in Colorado and nearby states. *Id.* at 6. The permit also authorizes other individuals to conduct these activities if they are "under the direct, on-site supervision of" Mr. Becker. *Id.* at 12. Thus, irrespective of the Cooperative Agreement, Colorado officials are authorized to conduct release activities under Mr. Becker's supervision.[2]

---

[2] A wholesale injunction against gray wolf releases is also unwarranted because Section 5(b) of the Cooperative Agreement includes a curing period. It provides that if FWS finds the State program deficient, the Agreement does not automatically terminate and,

7

Because these other sources of take authorization are not before the Court, it cannot enjoin activities undertaken pursuant to them. *See Little*, 607 F.3d at 1251; *De Beers*, 325 U.S. at 220; *Stouffer*, 2010 WL 567998, at *2. Thus, even a final judgment in Petitioners' favor on the merits of their claims could not supply the relief requested in the complaint. Petitioners have failed to demonstrate that they are likely to ultimately prevail in this case, making preliminary injunctive relief inappropriate.

### 2. The harmless error rule obviates Petitioners' NEPA claims.

Petitioners are unlikely to succeed on the merits for another reason: any failure to conduct a NEPA analysis with respect to the Cooperative Agreement's renewal is rendered harmless by the Service's NEPA process for the 10(j) Rule. "The harmless error rule applies to judicial review of administrative proceedings, and errors in such administrative proceedings will not require reversal unless Plaintiffs can show they were prejudiced." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993); *see also All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1443 (10th Cir. 1992). For example, potential NEPA violations stemming from an agency "segmenting" its analysis into multiple documents were harmless where the plaintiff failed to identify a "concrete

---

instead, "appropriate changes" can be made by June 30 of the year following the agreement's renewal. ECF 1-1 at 10 (Cooperative Agreement § 5(b)). Because even a substantive legal deficiency would merely trigger a curing period, not termination, an alleged procedural violation does not merit the more drastic remedy of injunctive relief. Petitioners respond that the pre-October 19, 2023 version of the Agreement did not authorize reintroduction, but there appears to be no disagreement that the Cooperative Agreement was in fact renewed twice following the 2020 passage of Proposition 114. *See* ECF 17 at 9; ECF 5-1 at 1 (renewal request stating that there were "no statutory changes" since the last submission and acknowledging State's obligation to list for FWS "any substantial changes" it had made to its program under its existing authority in the interval between renewal requests).

8

environmental impact that was missed" due to the agency's approach. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 74 (D.D.C. 2018).

Here too, Petitioners have failed to show that they were prejudiced by some environmental impact "that was missed." *Id.* Petitioners claim that the Service wholly "fail[ed] to perform NEPA analysis" on a range of topics arising from wolf restoration, including interactions between wolves and livestock, interactions between wolves and wild ungulates, "and much more." TRO Mot. 19–20. But the Service *did* assess these impacts in conjunction with Colorado's reintroduction effort in the 10(j) FEIS. That analysis was finalized following a year-and-a-half-long public-comment process, with the Service issuing its final FEIS in September 2023, *see* 10(j) FEIS at 1-6—shortly before the Cooperative Agreement's renewal on October 19, 2023, *see* ECF 5-2.

The environmental issues Petitioners identify were evaluated in that review. The 10(j) FEIS includes three separate subsections titled "Impact on Agriculture and Livestock Production"—one for each alternative analyzed—that discuss in detail potential effects to livestock production arising from Colorado's reintroduction of wolves. 10(j) FEIS at 4-15 to 4-25. In fact, the word "livestock" appears 966 times in the 10(j) FEIS. The Service also evaluated potential impacts to Gunnison sage-grouse, acknowledging concerns similar to those expressed by Petitioners at oral argument and concluding that wolves would likely have little impact on the species. *See id.* at 4-7, 4-37, and Response to Comments 16, 19, 90–91, 104–05. These analyses belie Petitioners' claim that the Service unlawfully tried to "deliberately avoid analysis of the many impacts of the major action of wolf reintroduction." TRO Mot. 20. As another court

9

aptly put it, "[i]f the agencies were attempting to hide the ball, . . . they did a poor job indeed." *Standing Rock Sioux*, 301 F. Supp. 3d at 74 (cleaned up).

For these reasons, Petitioners have failed to demonstrate that they were prejudiced by the Service's 389-page 10(j) FEIS and 18-month public participation process. They are unlikely to succeed on the merits of this claim. *Accord Coalition*, 2004 WL 7337667, at *19 ("Plaintiffs have not shown a likelihood of success on the merits of their NEPA claim regarding the reintroduction and translocation of Mexican gray wolves.")

### B. Petitioners fail to establish that imminent, irreparable harm is likely.

A movant for preliminary injunctive relief must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. A mere "possibility of irreparable harm" is not enough. *See id.* Economic loss does not typically constitute irreparable harm, as economic loss is fully compensable after the fact by money damages. *N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017). To satisfy its burden of proving irreparable harm, the party seeking injunctive relief must show that the harm is "certain and great" and not speculative. *Id.*

Here, the Petitioners have not satisfied their burden to demonstrate irreparable harm resulting from any deficiency in the NEPA analysis for the renewal of the Cooperative Agreement. This is so for three reasons.

First, the Petitioners' concerns regarding potential harm to livestock and to Gunnison sage-grouse are too speculative to support a finding of irreparable harm. With respect to the sage-grouse, Petitioners' members testified that they support

conservation efforts for this species. *See, e.g.*, ECF 5-6 (Trampe Decl.). In addition, witnesses testified at the hearing that they have a concern for this species and wish to see the bird do well. However, both of Petitioners' witnesses admitted that they have no scientific expertise or specialized knowledge of the species. Nor did Petitioners attempt to qualify any witness as an expert on sage-grouse. For this reason, the Court credits the undisputed agency finding that the presence of wolves will not have an impact on sage-grouse. ECF 19 at 8 (State Respondents' Br., quoting FEIS at 4-7); *see Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1060 (10th Cir. 2014) ("Our deferential review [of agency action] 'is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.'" (quoting *Utah Env't Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008)).[3]

With respect to livestock losses, the Court finds that these claims of potential harm are speculative as well. At the hearing, Petitioners' witnesses described their concerns regarding livestock losses as "worries" about what "might" happen to their livestock. Petitioners are required to demonstrate, however, that irreparable harm is both imminent and "likely." *Winter*, 555 U.S. at 22. The record before the Court does not

---

[3] Although the Court does not question Petitioners' witnesses' genuine concern for the Gunnison sage grouse, the Court notes that, as an organization, the Gunnison County Stockgrowers' Association has a record of challenging ESA protections for the sage grouse in court. *See Colorado v. U.S. Fish & Wildlife Serv.*, 362 F. Supp. 3d 951, 960 (D. Colo. 2018). The Court also notes the evidence suggesting that the Cooperative Agreement itself facilitates sage-grouse conservation efforts. There appears to be no dispute that as the Federal Defendants note in their brief, the Cooperative Agreement "allows for funding of conservation activities," ECF 17 at 9, or that the summary of conservation activities included under the Cooperative Agreement at the heart of Petitioners' challenge includes a variety of efforts directed towards the Gunnison Sage Grouse, *see* Exhibit C to Petitioners' Mot., ECF 5-3 at 3-4.

substantiate a likelihood of imminent livestock losses, particularly in the context of a request for emergency relief. Data submitted to the Court by the Conservation Groups, and not rebutted by Petitioners, demonstrate that in other states with hundreds or thousands of wolves, predation affects mere fractions of a percent of total livestock populations. *E.g.*, ECF 22-1, Appx. Supp. Mot. Interv. at 0068-76 (Wight Decl., Ex. A); ECF 14-1 at 005 (English Decl., ¶ 12).

Moreover, the impending releases that Petitioners seek to enjoin on an emergency basis would involve a small number of wolves. Counsel for the State Respondents stated at the hearing that the initial release would include fewer than 10, and likely only 5, animals. Indeed, one of Petitioners' witnesses, Mr. Spann, admitted that he was not concerned about livestock losses resulting from a small number of wolves, although he was concerned about losses if wolf populations increase. Finally, Petitioners' witnesses testified as to worries regarding their ability to renew their grazing leases after wolf reintroduction, but they provided no concrete reason to suspect this may occur. The Court credits evidence demonstrating that the agencies have sought to work with livestock growers to minimize livestock losses. *E.g.*, ECF 14-1 at 018-109 (Scheider Decl., describing CPW's Conflict Minimization Program). In contrast, the Court has been provided with no evidence to assume that the agencies would reverse course. On this record, the Court concludes that Petitioners have failed to show a likelihood of livestock losses warranting emergency relief.

Second, the Court finds that any potential losses to livestock are economic losses that are compensable with money damages. Indeed, CPW is required under

state law to pay "fair compensation to owners of livestock for any losses of livestock caused by gray wolves." Colo. Rev. Stat. § 33-2-105.8(2)(e)(2). CPW is offering compensation up to $15,000 per animal for livestock losses. 2 Colo. Code Regs. 406-17:17162.A.2. Although the Court does not discount the significance of these economic losses, were they to occur, they are compensable with money damages and thus cannot suffice to support a showing of irreparable harm. *N.M. Dep't of Game & Fish*, 854 F.3d at 1250; *see also Coalition*, 2004 WL 7337667, at *22 (finding state's wolf compensation plan and other mitigation measure were "sufficient to preclude a showing of the type of risk of irreparable harm necessary to warrant preliminary injunctive relief").

Finally, the timing of this lawsuit undercuts any showing of harm. Petitioners sued roughly two months after the Cooperative Agreement was renewed on October 19, 2023, *see* ECF 5-2, and three years after the passage of Proposition 114, which clearly set forth the December 31, 2023 reintroduction date that the State has relied upon in planning the reintroduction. ECF 1 ¶ 32. A delay of this magnitude undermines Petitioners' claims of urgency. *See Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1221 (D. Utah 2004), *aff'd*, 425 F.3d 1249 (10th Cir. 2005) (finding 4-month delay in seeking relief "belie[d] any irreparable injury to" the plaintiffs' rights); *Mont. Wyo. State Area Conf. of NAACP*, 2022 WL 1061906, at *5 ("Waiting three months to file this lawsuit and seek a TRO . . . is not consistent with plaintiffs' allegations that they are facing imminent harm.").

At bottom, the Court finds Petitioners' claims of imminent, irreparable harm are too speculative to support an injunction—a conclusion bolstered by their own delay in seeking redress. This factor weighs firmly against injunctive relief.

### C. The balance of equities and public interest weigh against an injunction.

Petitioners must also show "that the threatened injury outweighs the harms that the preliminary injunction will cause" and that "the injunction, if issued, will not adversely affect the public interest." *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020). "These factors 'merge' when the government is the opposing party." *Id.* at 990–91. Accordingly, the Court will analyze them together.

Harm befalls the public "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)); *see also, e.g.*, *Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 812 (D. Or. 2022) (finding state's interest "particularly strong" where challenged measure "was enacted directly by a majority of Oregon voters").

The Court finds that this form of substantial harm applies here, where the law in question was approved by the majority of Colorado voters. A majority of Coloradans voted for Proposition 114. *See* Colo. Sec'y of State, 2020 Abstract of Votes Cast at 146 (Proposition 114).[4] The text of the measure that Coloradans approved in 2020 requires CPW to "take the steps necessary to begin reintroductions of gray wolves by December

---

[4] https://www.sos.state.co.us/pubs/elections/Results/Abstract/2020/2020Biennial AbstractBooklet.pdf.

14

31, 2023." Colo. Sec'y of State, 2019-2020 Initiative #107 (Final).[5] Thus, Coloradans did not vote for CPW to reintroduce wolves at some unknown time in the future; they voted for CPW to reintroduce wolves before the end of 2023. *See id.* The majority-supported requirement that CPW "[t]ake the steps necessary to begin reintroductions of gray wolves by December 31, 2023" was codified into law. C.R.S. § 33-2-105.8(2)(d).

Granting Petitioners' injunction to prevent the reintroduction of wolves would thus prevent CPW from effectuating its statutory mandate to reintroduce wolves before the end of 2023. Such an injunction would also subvert the will of more than 1.5 million Coloradans, who voted for wolves to be reintroduced into Colorado by the end of 2023. The Court finds that both the inability of CPW to effectuate Colorado law and the subversion of the will of Colorado voters outweigh any harm that Petitioners would suffer in the absence of an injunction.

Enjoining the Cooperative Agreement would also harm threatened and endangered species throughout Colorado. Federal Respondents offered a declaration from Liisa Niva, the Colorado Field Office Supervisor for the Service. Ms. Niiva attested that enjoining the Cooperative Agreement would negatively affect the partnership between CPW and the Service and reduce the conservation of threatened and endangered species in Colorado. *See* ECF 17-5 at ¶ 20. Specifically, CPW staff would be unable to conduct many conservation activities with ESA-listed species without obtaining a recovery permit, which Ms. Niiva estimated would take several years for all

---

[5] https://www.sos.state.co.us/pubs/elections/Initiatives/titleBoard/filings/2019-2020/107Final.pdf.

ESA-listed species in Colorado. *Id.* at ¶ 19. The Court finds this evidence credible, mindful that the "language, history, and structure of the ESA demonstrate Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species' when considering motions for preliminary injunctive relief." *Forest Guardians v. U.S. Forest Serv.*, No. 04-cv-00011, 2004 WL 7338105, at *18 (D.N.M. Feb. 4, 2004) (quoting *Nat'l Wildlife Fed'n v. Burlington Northern R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994)). As a result, the Court holds that the harm caused to ESA-listed species in Colorado by enjoining the Cooperative Agreement would outweigh any harm that Petitioners would suffer in the absence of an injunction.

The public interest in the enjoyment of species also serves as a "significant interest" when considering a preliminary injunction. *W. Watersheds Project v. U.S. Forest Serv.*, No. 1:17-cv-00434, 2017 WL 5571574, at *14 (D. Idaho Nov. 20, 2017). The public's strong interest in wolf reintroduction is readily apparent here, as six conservation groups moved to intervene in this case within one day of Petitioners' motion for a temporary restraining order. ECFs 14, 18, 22. These groups collectively submitted 14 declarations demonstrating the significant public interest in introducing gray wolves by the end of 2023 and furthering the conservation of the species. ECFs 14-1, 18-1, 22-1.

In *Coalition*, the court determined that "the balance of hardships and the public interest weigh[ed] in favor of allowing the reintroduction and translocation of Mexican gray wolves to proceed." 2004 WL 7337667, at *22. That was primarily because "such reintroduction and translocation efforts are likely to further the conservation of the

species and thereby advance . . . congressional priorities" in passing the ESA. *Id.* The Court reaches the same conclusion here.

In sum, the Court finds that the balance of harms and public interest—along with the other factors discussed above—weigh against Petitioners' requested relief.

## CONCLUSION

Because the relief sought here bears little relationship to the claims pled, and because the injunction factors weigh against an injunction, Petitioners have failed to meet the high burden of showing that their "right to relief [is] clear and unequivocal." *Beltronics*, 562 F.3d at 1070. The Court DENIES their request for such "extraordinary" relief. *Mrs. Fields*, 941 F.3d at 1232.

December __, 2023.

                          HON. REGINA M. RODRIGUEZ
                          United States District Judge