IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-3258-RMR

GUNNISON COUNTY STOCKGROWERS' ASSOCIATION, INC., a Colorado Nonprofit Corporation; and
COLORADO CATTLEMEN'S ASSOCIATION, a Colorado Nonprofit Corporation,

    Plaintiffs,

v.

U.S. FISH AND WILDLIFE SERVICE;
MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife Service;
COLORADO DIVISION OF PARKS AND WILDLIFE;
JEFF DAVIS, in his official capacity as Director of Colorado Parks and Wildlife;
ERIC ODELL, in his official capacity as Wolf Conservation Program Manager for Colorado Division of Parks and Wildlife; and
COLORADO PARKS AND WILDLIFE COMMISSION,

    Defendants.

## [PROPOSED] ORDER DENYING PLAINTIFFS' MOTION FOR STAY OF AGENCY ACTION, PRELIMINARY INJUNCTION, AND TEMPORARY RESTRAINING ORDER

Having reviewed Plaintiffs' motion for a stay of agency action, preliminary injunction, and temporary restraining order, as well as the responses thereto, and having heard testimony and argument at the hearing on Plaintiffs' motion, the Court **DENIES** Plaintiffs' motion for the reasons below.

## BACKGROUND

On November 3, 2020, Colorado voters approved Proposition 114, a citizen-initiated ballot measure requiring Colorado Parks and Wildlife (CPW) to take the

steps necessary to begin restoration of gray wolves to Colorado by December 31, 2023 (now codified at C.R.S. § 33-2-105.8, as amended).  As required by Proposition 114, the Parks and Wildlife Commission adopted a final Wolf Restoration and Management Plan (Wolf Plan) in May 2023.[1]

Because gray wolves are listed as endangered in Colorado under the Endangered Species Act (ESA), Colorado does not have sole, or even primary, jurisdiction over the management of gray wolves.  Rather, the U.S. Fish and Wildlife Service (the Service) is responsible for the ESA's provisions as relevant here for the gray wolf.

The ESA provides for cooperation between the federal government and the States. Under Section 6(c), the Secretary of the Interior or Commerce "is authorized to enter into a cooperative agreement in accordance with this section with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species." 16 U.S.C. § 1535(c)(1).

The cooperative agreement process begins with the State submitting a copy of its State program for the conservation of endangered and threatened species. *Id.* Once a state does so, the Secretary "shall make a determination whether such program is in accordance with this chapter." *Id.*  That determination turns on five

---

[1] Available at: https://cpw.state.co.us/Documents/Wolves/2023-Final-CO-Wolf-Plan.pdf (accessed December 15, 2023).

factors relating to the program set out in Section 6: (a) the State wildlife agency has authority to conserve listed species; (b) the State agency has established acceptable conservation programs for listed species in the State and shared it with the Service; (c) the State agency can investigate the status and needs of resident species of fish and wildlife; (d) the State agency is authorized to establish programs and conserve habitat for listed species; and (e) the public may participate in designation of resident species of fish or wildlife as threatened or endangered. *Id.* "Unless [the Secretary] determines . . . that the State program is not in accordance with this chapter, he shall enter into a cooperative agreement with the State for the purpose of assisting in implementation of the State program." *Id.*

Colorado submitted its program to the Secretary of the Interior, and the Service entered into a cooperative agreement with CPW's predecessor in 1976. In accordance with Section 6(c), the agreement has been renewed every year since. Since at least 2013, gray wolves have been listed as a covered species under CPW's cooperative agreement with the Service.

Following the passage of Proposition 114, the Service renewed its cooperative agreement with CPW in 2021 and 2022. The renewal requests did not refer to or discuss CPW's efforts to achieve wolf reintroductions by December 31, 2023. The Service did not complete any analysis under the National Environmental Policy Act (NEPA) in approving these renewals of the cooperative agreement.

Most recently, on October 17, 2023, CPW requested renewal of its Section 6 agreement with the Service. The materials CPW submitted in support of its renewal request included the State's wolf management plan. On November 20, 2023, the Service approved renewal of the cooperative agreement, again without any analysis under NEPA.

Concurrent with its efforts to reintroduce wolves, CPW asked the Service to promulgate a rule under Section 10(j) of the ESA establishing a non-essential, experimental population of gray wolves in Colorado. The Service issued a proposed rule in February 2023. *See Endangered and Threatened Wildlife and Plants; Establishment of a Nonessential Experimental Population of the Gray Wolf in Colorado*, 88 Fed. Reg. 77,014-01 (Nov. 8, 2023). On November 8, 2023, the Service published the final rule, which became effective December 8, 2023. *Id.*

CPW plans to begin releasing wolves into Colorado imminently.

On December 12, 2023, Plaintiffs filed the present complaint. ECF No. 1. Plaintiffs named as defendants the Service, Martha Williams in her official capacity as the Service's Director, the Colorado Division of Parks and Wildlife, Jeff Davis in his official capacity as Director of Colorado Parks and Wildlife, Eric Odell in his official capacity as wolf conservation program manager for the Colorado Division of Parks and Wildlife, and the Colorado Parks and Wildlife Commission. But Plaintiffs include only one cause of action: that the Service's November 2023 renewal of

4

CPW's cooperative agreement violated NEPA because the Service did not prepare an environmental impact statement (EIS) for the Section 6 renewal.

That same day, Plaintiffs also filed a motion for a stay of agency action, preliminary injunction, and temporary restraining order. ECF No. 5. Plaintiffs ask the Court to stay the Service's renewal of the cooperative agreement pending resolution of this case and to enjoin CPW from reintroducing gray wolves into Colorado. The Court ordered expedited briefing on Plaintiffs' request for a temporary restraining order and held a hearing on the motion on December 14, 2023.

## APPLICABLE LAW

The standards for issuing a preliminary injunction and temporary restraining order are the same. *Nellson v. Barnhart*, 454 F. Supp. 3d 1087, 1091 (D. Colo. 2020). A stay of agency action under the federal Administrative Procedure Act, 5 U.S.C. § 705, "is a provisional remedy in the nature of a preliminary injunction," and turns on the same four factors. *Zeppelin v. Fed. Hwy. Admin.*, 305 F. Supp. 3d 1189, 1200 (D. Colo. 2018) (citing *Winkler v. Andrus*, 614 F.2d 707, 709 (10th Cir. 1980)).  "Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal." *Planned Parenthood of Kansas v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018).

To receive a preliminary injunction, the movant must establish all of the following: "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (quoting *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007)). The third and fourth factors merge when the government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

It is the movant's burden to establish that each of these factors tips in his or her favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188–89 (10th Cir. 2003).

## **ANALYSIS**

Plaintiffs have failed to establish that any of the required factors tips in their favor, and have therefore failed to show entitlement to the emergency and preliminary relief they request.

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

As stated above, to obtain injunctive relief, Plaintiffs must demonstrate a substantial likelihood of success on the merits of their claims. Plaintiffs have failed to meet that burden for two reasons. First, they are unlikely to succeed on their claim that the Service failed to comply with NEPA when it renewed its Section 6(c) cooperative agreement with CPW. Second, even if Plaintiffs were to succeed on that claim, they have not shown they are entitled to an injunction preventing CPW from reintroducing wolves as required by Colorado law.

First, Plaintiffs are unlikely to succeed on the merits of their claim that the Service failed to comply with NEPA when it renewed its Section 6(c) cooperative agreement with CPW. As mentioned above, Section 6(c) provides that the Secretary of the Interior, here acting through the Service, "shall enter into a cooperative agreement with the State" unless the Secretary determines that the State's conservation plan is not adequate and active. 16 U.S.C. § 1535(c)(1). That is a mandatory duty, without room for discretion. And the Service determined that the State's plan is adequate and active. While Plaintiffs point to the underlying factors for determining whether a plan is adequate and active in support of their argument that the Service had discretion here, that is not the determination they challenge: they have brought no substantive ESA claims relating to the Service's finding that the State's plan is adequate and active. They only challenge the

7

Service's decision to enter into the cooperative agreement. Thus, because the Service made a finding that the State's plan was adequate and active, it had no discretion to do anything other than renew the cooperative agreement.[2]

Because the Service had no discretion in taking the action Plaintiffs challenge—renewing the cooperative agreement—Plaintiffs' claim lacks merit. NEPA provides that "[a]n agency is not required to prepare an environmental document with respect to a proposed agency action if . . . the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action." 42 U.S.C. § 4336(a)(4). Similarly, NEPA's implementing regulations state that "Major Federal action does not include . . . [a]ctivities that are non-discretionary and made in accordance with the agency's statutory authority." 40 C.F.R. § 1508.1(q)(1)(ii). The action here was non-discretionary—the Service had no authority to take environmental factors into consideration. Once the Service found the State's plan adequate and active, again a finding not challenged by Plaintiffs, the Service was required to renew the cooperative agreement. Section 6(c) commanded it to do so by use of the word

---

[2] The Court also notes that, in any event, the 10th Circuit has already rejected the argument that similar triggering criteria for a mandatory duty are not discretionary, but at best reflect the exercise of judgment. *Nat. Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1252–56 (10th Cir. 2021). The underlying "adequate and active" factors thus do not provide a separate basis for finding a NEPA obligation.

"shall." As such, under NEPA, no environmental analysis was required. Plaintiffs therefore cannot succeed on the merits of their claim.[3]

Second, even if Plaintiffs could succeed on their claim that the Service failed to comply with NEPA when it renewed its Section 6(c) cooperative agreement with CPW, they are unlikely to succeed on their request for a permanent injunction prohibiting CPW from releasing wolves into Colorado until the Service does so. *See* Verified Compl. at 17.

The Service's 10(j) rule, which the Plaintiffs do not challenge, provides independent authority for CPW to reintroduce gray wolves. As the rule recognizes, "CPW officials plan to capture wild gray wolves in cooperating States in the Western United States where wolves are federally delisted (Montana, Idaho, Wyoming, and the eastern third of Washington and Oregon, and north-central Utah)." 88 Fed. Reg. at 77022. After capturing the wolves, CPW plans to transport

---

[3] The Court also notes that because the 2023 renewal of the cooperative agreement was a continuation of the longstanding status quo, this provides another ground for concluding that no NEPA analysis was required. CPW's cooperative agreement has included gray wolves since 2013. The agreement has therefore already been providing the State with take exemption for gray wolves for a decade. The State has exercised that authority in managing gray wolves that have naturally migrated into the State. Because the 2023 renewal merely continued this status quo, NEPA analysis was not required for the renewal. This also reflects that any setting aside of the agreement would be a disfavored form of relief – changing the status quo. And the fact that the agreement was renewed in 2021 and 2022—after the passage of Proposition 114—with wolves as a listed species and without NEPA analysis also weighs against a finding of irreparable harm, discussed further below, as it demonstrates delay in bringing this action.

them to Colorado, *see id.*, where the Service has established a nonessential experimental population. *See id.* at 77021.

CPW does not need the Service's authorization to capture and transport wolves from an area where they are federally delisted to Colorado. Once in Colorado, where wolves are federally listed, CPW needs authority from the Service to "take"[4] them under the ESA. The Service's 10(j) rule authorizes CPW to do just that. Specifically, the rule provides that, "[w]hen acting in the course of official duties, any employee of the service or *a designated agent may take a wolf, when necessary, in regard to the release*, tracking, monitoring, recapture, and management of the [nonessential experimental population the rule establishes]." 88 Fed. Reg. at 77038. CPW is a "designated agent," CPW resp., exh. 1, ECF No. 19-1, and is therefore authorized to take wolves "in regard to the release" in Colorado. CPW needs no additional authorization from the Service to reintroduce wolves into Colorado.

Because the Service's 10(j) rule authorizes CPW to take all the actions necessary to reintroduce wolves independent of the Section 6 cooperative

---

[4] The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

agreement, staying the Service's renewal of the cooperative agreement pending resolution of this case would not prevent CPW from reintroducing wolves.[5]

For these reasons, Plaintiffs have not shown a substantial likelihood of success on the merits of their claim.

## II. IRREPARABLE HARM

Even if Plaintiffs could establish a substantial likelihood of success on the merits of their claim, they would still need to show they will suffer irreparable harm if their requested relief is not granted. "Irreparable harm" means that the injury "must be both certain and great"; it must not be "merely serious or substantial." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001). Further, "simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). Plaintiffs must show both that the harm will occur and, when it does, the harm will be irreparable." *Vega v. Wiley*, 259 Fed. App'x 104, 106 (10th Cir. 2007) (unpublished); *See also Heideman*, 348 F.3d at 1189.

Here, Plaintiffs have not presented evidence demonstrating that harm will occur if their requested relief is not granted, nor have they demonstrated such

---

[5] For this reason, the Plaintiffs may also be unable to establish that the harms they allege are sufficiently redressable to give them Article III standing. *See Zeppelin*, 305 F. Supp. 3d at 1199.

harm, if it did occur, would be irreparable. Indeed, their evidence of harm is purely speculative and much of it points to purely economic harms.

Plaintiffs' central allegation is that the presence of wolves "in the Gunnison Basin and elsewhere in Colorado will cause Plaintiffs and their members significant harm resulting from impacts to other species conservation efforts, *livestock losses to predation and increased livestock stress, and high costs of conflict deterrence.*" Pls' Mot. at 4, ECF No. 5 (emphasis added). They also highlight that:

> The presence of wolves imposes significant costs on the livestock industry and the communities that depend on it. The cost to implement mitigation measures to decrease conflicts between wolves and livestock can be significant while not providing permanent or guaranteed results. Such measures commonly include hiring additional range riders, deploying guard dogs, and installing barriers or electrified flagging, lights, and sound devices that may ward off wolves, among other things.

*Id.* at 13 (citations omitted); *see also* Verified Compl. ¶49 (complaining of increased costs on livestock and other industries); *id.* ¶ 50; *id.* ¶ 52 (Plaintiffs' members will "suffer specific negative effects due to the presence of wolves, including but not limited to predation, livestock stress, and the economic cost of wolf deterrence measures").

At the hearing, Plaintiffs' witnesses repeated many of the same concerns. But these harms are not irreparable because they are capable of monetary compensation. Indeed, Colorado maintains a compensation program of up to $15,000 per head for owners whose livestock are killed or injured by gray wolves,

and includes reimbursement for veterinary bills and indirect losses caused by stress. *See* Wolf Plan at 32-35; 2 CCR 406-17:17162.

Testimony at the hearing also confirmed that, to the extent the harms Plaintiffs fear are not economic, they are speculative. The witnesses stated they worried that due to the *anticipated* presence of wolves on their federal grazing allotments, their grazing permits *might* not be renewed, and testified that they *believed* recreational uses on federal lands – hunting in particular – *could* be impacted.

But their testimony did not point to any "certain, imminent, and serious" harm. *New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1251 (10th Cir. 2017) (denying preliminary injunction due to the plaintiff's failure to identify or address the "type, likelihood, imminence, or degree of harm" that release of wolves would have on the state's ungulate species and speculative assertions that increasing the population of wolves "*has the potential* to affect predator-prey dynamics . . . .").

Plaintiffs also expressed concern, both in affidavits and testimony, that reintroducing wolves might impact the recovery of Gunnison sage-grouse, a federally threatened species whose range is restricted to southwest Colorado. But Plaintiffs' witnesses admitted that the Service's final EIS for the 10(j) rule, which Plaintiffs do not challenge, considered potential impacts on the birds and

13

concluded that "the presence of wolves will not have an impact on populations of threatened and endangered species in Colorado, specifically lynx and Gunnison sage-grouse." *Final Environmental Impact Statement – Colorado Gray Wolf 10(j) Rulemaking*, Sept. 2023 at 4-7. Plaintiffs' concerns are therefore unsupported and speculative.

Finally, in addition to being speculative and compensable, the harms Plaintiffs allege are not irreparable, and therefore not certain to occur. Any wolves released by CPW as part of the wolf reintroduction will have tracking collars on them, 88 Fed. Reg. at 77022; Wolf Plan at 20, so they can be located and recaptured if subsequently required by the Court. And whether the initial, small group of wolves to be released will make their way to the areas Plaintiffs are concerned about and cause the effects Plaintiffs fear is far from imminent or certain. Plaintiffs have thus failed to demonstrate harm that is sufficiently certain, imminent, and non-compensable to justify an injunction.

### III. BALANCE OF HARDSHIPS AND PUBLIC INTEREST

Plaintiffs must show that their threatened injury outweighs the injury to the other parties and an injunction is in the public interest. *Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1113–14 (D. Colo. 2021). These factors merge when the government is the party opposing injunctive relief. *Nken*, 556 U.S. at 435.

The equities and public interest weigh against injunctive relief for two reasons. First, the relief requested is not narrowly tailored. Plaintiffs are concerned with potential impacts they fear might result from the release of gray wolves in Colorado. Pls' Mot. 3, 13. But they ask the Court to stay the Service's renewal of the Section 6 cooperative agreement in its entirety. That agreement applies to many other federally threatened and endangered species in Colorado and allows CPW to receive federal funding and perform conservation activities for these species. If the Court were to stay the agreement, CPW would no longer be eligible for Section 6 funding, which risks harm to other threatened and endangered species and undermines the public's interest in preserving and protecting listed species such as the black-footed ferret, Preble's meadow jumping mouse, Eastern black rail, and the greenback cutthroat trout, as well as the Gunnison sage-grouse. *See* Pls' verified mot., exh. C, ECF. No. 5-3.

Second, injunctive relief is contrary to the public's interest in seeing gray wolves released in Colorado. Voters passed Proposition 114 in 2020, which required the State to take steps to begin the reintroduction of gray wolves by December 31, 2023. *See* C.R.S. § 33-2-105.8. Plaintiffs now ask the Court to halt the release of wolves and enjoin CPW from carrying out the will of Colorado voters. Doing so would be contrary to the public interest.

Moreover, in line with the expressed interest of the public, CPW has spent years preparing to reintroduce wolves into Colorado. CPW has devoted substantial public resources to this effort, and presented evidence that some of those would be lost if it were forced to delay its efforts. More importantly, however, any delay will not serve the public interest in CPW satisfying the will of the voters to "[t]ake the steps necessary to begin reintroductions of gray wolves by December 31, 2023." C.R.S. § 33-2-105.8(2)(d).

## CONCLUSION

Plaintiffs have failed to show that any of the four required factors weighs in favor of granting an injunction, much less all of them, so their request for a stay of agency action, preliminary injunction, and temporary restraining order is **DENIED.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December, 2023, I electronically transmitted the attached [PROPOSED ORDER] to the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Christopher Breidenbach*
Christopher G. Breidenbach