**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-3258-RMR

GUNNISON COUNTY STOCKGROWERS' ASSOCIATION, INC., a Colorado Nonprofit
Corporation; and
COLORADO CATTLEMEN'S ASSOCIATION, a Colorado Nonprofit Corporation,

      Plaintiff Petitioners,

v.

U.S. FISH AND WILDLIFE SERVICE;
MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife
Service;
COLORADO DIVISION OF PARKS AND WILDLIFE;
JEFF DAVIS, in his official capacity as Director of Colorado Parks and Wildlife;
ERIC ODELL, in his official capacity as Wolf Conservation Program Manager for Colorado
Division of Parks and Wildlife; and
COLORADO PARKS AND WILDLIFE COMMISSION,

      Defendant Respondents,

      and

Defenders of Wildlife,
FRIENDS OF ANIMALS;
WILDEARTH GUARDIANS;
WESTERN WATERSHEDS PROJECT
HUMANE SOCIETY OF THE UNITED STATES,

      Conditional Intervenor Respondents.

---

## ORDER

---

      This issue comes before the court on Petitioners' Motion for Stay of Agency Action,

Preliminary Injunction and Temporary Restraining Order. Having fully considered the merits and

arguments presented by the parties, the Court hereby GRANTS Petitioners' Motion.

# BACKGROUND

Petitioners in this case are the Gunnison County Stockgrowers' Association, Inc. ("GCSA") and the Colorado Cattlemen's Association ("CCA"), two nonprofit organizations representing the ranching community and interests across the State of Colorado. Respondents brought this action against the United States Fish and Wildlife Service ("FWS"), Martha Williams, in her official capacity as director of the FWS, the Colorado Division of Parks and Wildlife, Jeff Davis, in his official capacity as Director of Colorado Parks and Wildlife, Eric Odell, in his official capacity as Colorado Parks and Wildlife Wolf Conservation Program Manager, and the Colorado Parks and Wildlife Commission ("Commission" and collectively with Defendant Division, "CPW") to challenge the decision of FWS to renew the Cooperative Agreement entered into between FWS and CPW (the "Agreement") pursuant to section 6(c) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1535(c), for the period of October 1, 2023 through September 30, 2024 without first preparing an environmental impact statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA"). Petitioners allege that renewal of the Agreement for this upcoming period was an approval of the CPW's plan to reintroduce and manage gray wolves that grants CPW the legal authority necessary to procure and import gray wolves, a highly controversial endangered species, into Colorado.

## JURISDICTION

This action arises under NEPA, 42 U.S.C. § 4321 *et seq.*, and was brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* The Court has jurisdiction over this matter under 28 U.S.C. § 1331, which grants the district courts federal question jurisdiction,

and 28 U.S.C. § 1361, which grants jurisdiction to the district courts over an action in mandamus to compel the performance of duties by federal officers, and may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201 and 2202.

## I. Authority Over State Defendants

The Court has authority to enjoin CPW, despite CPW's arguments to the contrary. *See* State Resp., ECF No. 19, at 2–4. CPW argues that the Court has no authority to enjoin them here because Petitioners have not brought a claim against them, which is thus "fatal to [Petitioners'] request for an injunction." State Resp., ECF No. 19, at 3. However, it is well established in the Tenth Circuit that a nonfederal entity may be enjoined in cases such as this "in which the nonfederal actor, by its unrestrained actions, could defeat the objectives sought in the suit against the [federal] agency" brought under the APA. *Sierra Club v. Hodel*, 848 F.2d 1068, 1077 (10th Cir. 1988), *abrogated on other grounds by Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992).State Resp., ECF No. 19,

In addition, the Tenth Circuit has approved injunctions against state agencies in several similar cases brought under the APA for claims of a NEPA violation, even in cases where the state entities were not named parties. *E.g.*, *Ross v. Fed. Highway Admin.*, 162 F.3d 1046, 1053 (10th Cir. 1998); *see also Zeppelin v. Fed. Highway Admin.*, 293 F.Supp.3d 1267, 1284 (D. Colo. 2017) (stating that a non-federal entity is subject to APA jurisdiction by "consent through participation in a federal process, consent through accepting federal money, or both"). In *Ross v. Federal Highway Administration*, the plaintiffs sued the Federal Highway Administration, a federal agency, and several state officials in their official capacities seeking compliance with NEPA related to the construction of a highway in Kansas being built with federal funds. 162

F.3d at 1048–49. The district court in *Ross* enjoined the defendants and the Kansas Department of Transportation, a state agency that was not a named defendant in the case, from proceeding with construction of the highway until the federal agency prepared a new EIS. *Id.* at 1050. The Tenth Circuit upheld the district court's decision to enjoin the state agency, finding that the state "chose to develop this trafficway in conjunction with the federal government" and had therefore consented to jurisdiction of the court under federal laws. *Id.* at 1055.

## II.    Redressability

Respondents also raise what appears to be an issue with redressability, arguing that, even if the Court finds the Petitioners are likely to succeed on the merits of their claim, an injunction will not redress their injury because CPW still has authority to reintroduce wolves under the 10(j) rule. State Resp., ECF No. 19, at 4-5; U.S. Resp., ECF No. 17, at 7 n.2. An injury generally is redressable if the injury identified in the complaint can be redressed by the relief sought in the complaint. *Consumer Data Industry Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012). The Court finds the Petitioners' claimed injury is redressable by the relief they seek because CPW lacks authority under the 10(j) rule to reintroduce wolves in Colorado.

CPW points to subsection (5)(x) of the 10(j) Rule (50 C.F.R. § 17.84(n)), which authorizes Service employees or their designated agents to "take a wolf, when necessary, in regard to the release, tracking, monitoring, recapture and management of the NEP," among other things.[1] Hearing Tr. (Rough) at 68:19-69:5 (Dec. 14, 2023). However, this authority is limited to wolves that are part of the NEP, or "nonessential experimental population."50 C.F.R. §

---

[1] Pursuant to a memorandum of understanding executed on December 12, 2023 the Service has agreed CPW is a designated agent for purposes of administering the 10(j) Rule.

17.84(n)(5)(x). The 10(j) Rule provides that the "gray wolves identified in paragraph (n)(3) of this section constitute [the] nonessential experimental population." *Id*. § (n)(2). That subsection, in turn, identifies these wolves as "[a]ll gray wolves *found in the wild* within the boundary of the Colorado NEP area are considered nonessential experimental animals. *Id*. § (n)(3) (emphasis added).

The wolves CPW will transport into the state will not be "in the wild" when CPW first brings them into Colorado, but in captivity. They will not be part of the experimental population until CPW brings them to their release sites and actually releases them. Until then, they will not be part of the NEP and will remain a federally listed engendered animals. CPW will need its Section 6 authority to keep them captive and transport them to their release sites, or else its handling of the animals will be prohibited take under the ESA. 16 U.S.C. § 1538(a)(1)(B).[2]

Because the 10(j) rule does not provide CPW with an independent source of legal authority to reintroduce wolves in Colorado separate and apart from the Section 6 Agreement, the Court finds that granting Petitioners the relief they seek will redress their alleged injury.

## LEGAL BACKGROUND

### 1. The Endangered Species Act

---

[2] This is consistent with FWS's own description in the 10(j) FEIS of how CPW would carry out wolf reintroduction: "Once the State of Colorado has completed the action of reintroduction of the gray wolf *under the authority of the Section 6 Cooperative Agreement*, the Service has regulatory authority under the ESA to manage the conservation and recovery of federally listed threatened and endangered species, including creating rules and regulations and permitting legitimate activities that would otherwise be prohibited by federal law." U.S. Fish and Wildlife Service, *FEIS, Colorado Gray Wolf 10(j) Rulemaking* at 1-2 (Sept. 2023).

The ESA makes it illegal for any person to "take" any endangered species without a permit or authorization. 16 U.S.C. § 1538(a)(1)(B). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

Section 6 of the ESA authorizes the Secretary of the Interior "to enter into a cooperative agreement . . . with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species." 16 U.S.C. § 1535(c)(1). To determine that a state's program for the conservation of endangered and threatened species is adequate and active, "the Secretary must find and annually thereafter reconfirm such finding," that the state has established "acceptable conservation programs, consistent with the purposes and policies of [the ESA], for all resident species of fish or wildlife in the State which are deemed by the Secretary to be endangered or threatened, and has furnished a copy of such plan and program together with all pertinent details, information, and data requested to the Secretary." 16 U.S.C. § 1535(c)(1)(B). A qualified employee or agent of a state conservation agency which is a party to a cooperative agreement with FWS entered into pursuant to section 6(c) of the ESA who is designated by the agency for such purposes, may, when acting in the course of their official duties, "take" an endangered species covered by that cooperative agreement in accordance with the cooperative agreement if it does not result in the death or permanent disabling of the specimen. 16 U.S.C. § 1535(g)(2)(A); 50 C.F.R. § 17.21(c)(5)(i).

FWS may designate a population of an endangered species as "experimental" if it will be released into a habitat that is outside of the species' current range. 16 U.S.C. § 1539(j). Once designated, "each member of an experimental population shall be treated as a threatened

species," though its formal designation would remain endangered. 16 U.S.C. § 1539(j)(2)(C).

The individuals of an experimental population are then subject to a relaxed standard under the

ESA, allowing agencies to implement management tools and regulations otherwise prohibited.

*Id.* §§ 1539(j)(2)(C).

## II.     The National Environmental Policy Act

NEPA, 42 U.S.C. §§ 4321 *et seq.*, was enacted to ensure fully informed decision making

prior to approval and implementation of actions affecting the quality of the human environment

and to provide for public participation in such decision making. 40 C.F.R. § 1500.1(a). The

Council on Environmental Quality promulgates regulations implementing NEPA that are binding

on all federal agencies. 40 C.F.R. § 1500.3(a). NEPA requires an Environmental Impact

Statement ("EIS") to be prepared for all "major Federal actions significantly affecting the quality

of the human environment. . . ." 42 U.S.C. § 4332(2)(C). For proposed actions where the

environmental effects are uncertain, the agency must prepare an Environmental Assessment. 40

C.F.R. § 1501.5. Major federal action means "an activity or decision subject to Federal control

and responsibility" that is discretionary and results in final agency action. 40 C.F.R. §§

1508.1(q)(1)(ii), (iii). A non-federal project may be a major federal action subject to the

requirements of NEPA where a federal agency exercises "sufficient control and responsibility"

over the project. 40 C.F.R. § 1508.1(q)(1)(vi).

## III.     The Administrative Procedure Act

"Because [NEPA] does not contain a private right of action for those seeking to enforce

its procedural requirements, a plaintiff must rely on the Administrative Procedures Act (APA) as

the basis for its actions. . . ." *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996). Under the APA, a reviewing court will "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and "hold unlawful and set aside agency action" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D).

## DISCUSSION

Petitioners have met their burden for obtaining preliminary injunctive relief under Fed. R. Civ. P. 65 and Section 705 of the APA. *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). Furthermore, this temporary restraining order and preliminary injunction is not one of the three types of injunctions disfavored in the Tenth Circuit.[3] *See Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016).

### I. Legal Standard for Preliminary Relief

Petitioners seek an injunction and temporary restraining order pursuant to Fed. R. Civ. P. 65 to prevent the State Respondents from releasing wolves and a stay under Section 705 of the APA, 5 U.S.C. § 705, of FWS's renewal of the Agreement. The legal standard for relief under Rule 65 and Section 705 of the APA is the same, *Prairie Protection Colorado v. USDA APHIS Wildlife Servs.*, No. 19-CV-2537-WJM-KLM, 2019 WL 4751785, at *1 (D. Colo. Sept. 30, 2019) (citing *Winkler v. Andrus*, 614 F.2d 707, 709 (10th Cir. 1980)), and requires a showing that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer

---

[3] The Tenth Circuit has historically disfavored three types of injunctions: injunctions that alter the status quo; mandatory, as opposed to prohibitory, injunctions; and injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016).

irreparable harm in the absence of the relief; (3) the harm the movant is likely to suffer absent the injunction and order outweighs any harm the injunction and order will impose on the defendant; and (4) the injunction and restraining order is not adverse to the public interest. *RoDa Drilling Co.*, 552 F.3d at 1208 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

### A. *Success on the Merits*

To show likelihood of success on the merits, a movant "need not show a certainty of winning." *Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transp.*, 843 F.3d 886, 901 (10th Cir. 2016). Rather, the movant need only "present a prima facie case." *Id.* Here, Petitioners have made a prima facie case in support of their NEPA claim.

NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Major federal action includes approval of projects by permit or regulatory decision, 40 C.F.R. § 1508.1(q)(3)(iv), and does not include "[a]ctivities that are non-discretionary and made in accordance with the agency's statutory authority." 40 C.F.R. § 1508.1(q)(1)(ii). The Tenth Circuit has defined "major federal action" as "actions by the federal government . . . and nonfederal action with effects that may be major and which are potentially subject to Federal control and responsibility." *Ross*, 162 F.3d at 1051 (internal quotation marks omitted). Put simply, "major federal action means that the federal government has actual power to control the project." *Id.* (internal quotation marks omitted); 40 C.F.R. § 1508.1(q)(1)(vi) (stating that a non-federal project may be a major federal action subject to the requirements of NEPA where a federal agency exercises "sufficient control and responsibility" over the activity).

### i. *FWS's renewal of the Agreement was discretionary action.*

9

FWS asserts that its renewal of the Agreement was not discretionary, and therefore it was not required to comply with NEPA when renewing the Agreement. U.S. Resp., ECF No. 17, at 2; 40 C.F.R. § 1508.1(q)(1)(ii) (major federal action does not include "[a]ctivities or decisions that are non-discretionary and made in accordance with the agency's statutory authority"). Specifically, FWS asserts it is required to renew the Agreement if it finds the State's conservation programs are "active and adequate" pursuant to 16 U.S.C. § 1535(c)(1) and therefore its action was not discretionary. U.S. Resp., ECF No. 17, at 3. FWS's argument ignores the language of 16 U.S.C. § 1535(c)(1)(B), which plainly gives the agency discretion to consider a wide range of harms when weighing the renewal of a cooperative agreement under Section 6 of the Endangered Species Act.

Section 6 of the ESA authorizes the Secretary to enter into a cooperative agreement with any state "which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species." 16 U.S.C. § 1535(c)(1). It further provides that the Secretary "shall" make a determination of whether a state's program for managing threatened and endangered species is in accordance with the Endangered Species Act and, if it is, the Secretary "shall" enter into a cooperative agreement with the State. *Id*. To determine whether a state's program for managing listed species is "active and adequate," the Secretary is directed to consider 5 criteria:

(A) "Authority resides in the State agency to conserve resident species of fish or wildlife determined by the State agency or the Secretary to be endangered or threatened";
(B) The "State agency has established acceptable conservation programs, consistent with the purposes and policies of this chapter, for all resident species of fish or wildlife in the State which are deemed by the Secretary to be endangered or

threatened, and has furnished a copy of such plan and program together with all pertinent details, information, and data requested to the Secretary";

(C) The "State agency is authorized to conduct investigations to determine the status and requirements for survival of resident species of fish and wildlife";

(D) The "State agency is authorized to establish programs, including the acquisition of land or aquatic habitat or interests therein, for the conservation of resident endangered or threatened species of fish or wildlife"; and

(E) "[P]rovision is made for public participation in designating resident species of fish or wildlife as endangered or threatened."[4]

*Id*.

While the use of the term "shall" in the statute appears to be mandatory, even seemingly mandatory language in a statute can still leave an agency with considerable discretion. The 10th Circuit considered what makes an agency action discretionary versus nondiscretionary in *Natural Resources Defense Council v. McCarthy*, 993 F.3d 1243 (10th Cir. 2021). *McCarthy* noted that "'even mandatory actions . . . [may] be discretionary . . . when the statutory criteria are so open-ended that they leave the agency significant flexibility on *when* or *how* to act.'" *Id*. at 1253 (quoting *Nat'l Wildlife Fed'n v. Sec'y of the U.S. Dep't of Transp.*, 960 F.3d 872, 876 (6th Cir. 2020) (alterations in original)). The key is whether the criteria the agency must consider are broad enough that the agency exercises discretion as opposed to judgment when determining whether the criteria are met. *See id*.

While *McCarthy* found the particular regulation at issue in that case did not vest the agency with discretion, the court also listed circumstances where courts have found an agency has exercised discretion: (1) The agency is charged "'with developing . . . criteria' for when or how" to act. *Id.* at 1255 (*quoting Fla. Key Deer v. Paulison*, 522 P.3d 1133, 1142 (11th Cir.

---

[4] The Secretary can also elect to disregard factors (A) and (B) when renewing the agreement, but if he does so, the resulting cooperative agreement cannot affect the applicability of the take and other prohibitions in 16 U.S.C. § 1533(d) and 1538(a)(1). 16 U.S.C. § 1535(c)(1)(i)-(ii).

2008)). (2) The criteria are sufficiently "vague and wide-ranging," such as a mandate to consider " 'the public convenience and necessity.' " *Id.* (quoting *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1373 (D.C. Cir. 2017)). (3) The agency has "'discretion to impose terms and conditions' on its decision." *Id.* at 1255 (quoting *RESTORE: The North Woods v. U.S. Dep't of Agric.*, 968 F. Supp. 168, 175 (D. Vt. 1997)). (4) The agency is "'authorized, but not required, to make' a certain decision and therefore possessed total discretion to act." *Id.* (quoting *Friends of Columbia Gorge, Inc. v. U.S. Forest Serv.*, 546 F. Supp. 2d 1088, 1102 (D. Or. 2008)). (5) The criteria the agency is directed to consider "are so open-ended that they leave the agency significant flexibility on when or how to act." *Id.* (quoting *Nat'l Wildlife Fed'n,* 960 F.3d at 876).

Turning back to the Section 1535(c)(1) criteria the Secretary is directed to consider when determining whether a cooperative agreement is "active and adequate," the Court agrees four of the five criteria, specifically Sections 1535(c)(1)(A) and (C)-(E), are non-discretionary. These criteria are narrow, and FWS must simply determine whether a state agency's legal authority and conservation program satisfy them. However, Section 1535(c)(1)(B) is different: that subsection directs the Secretary to determine whether the State's conservation programs are "acceptable" and "consistent with the purposes and policies of the ESA." Those criteria are broad and give the agency considerable discretion to determine what is necessary for a state conservation program to be "acceptable." Because being "acceptable" is a "vague and wide ranging" criterion, *McCarthy*, 993 F.3d at 1255, FWS's determination of what constitutes an "acceptable" program is discretionary.

The Eleventh Circuit's analysis in *Florida Key Deer v. Paulison*, 522 F.3d 1133, 1141 (11th Cir. 2008), is instructive. In that case, the court weighed whether FEMA had discretion to consider impacts to endangered species when determining whether to issue flood insurance. *Id.* at 1142. *Paulison* noted that, while FEMA was required to issue flood insurance to localities that met certain statutory criteria, the criteria themselves were broad, and it was left to FEMA's discretion to determine what a locality had to show to demonstrate compliance. *Id.*

The statute at issue in *Paulison*, 42 U.S.C. § 4102(c), directs FEMA determine whether a locality requesting flood insurance has adequate land use and control measures in place. *Id.* Based on this, *Paulison* found that, "although FEMA is required to issue flood insurance to localities that satisfy certain criteria, FEMA itself is charged with developing those criteria and enjoys broad discretion in so doing."[5] *Id.*

That FWS's decision to renew the Agreement was discretionary is supported by text the Section 6 Agreement itself. The Agreement provides, in Section 5(b), that if FWS determines the "state's program or authorities are not in compliance with the criteria of Section 6(c) of the Act, and unless appropriate changes are made by June 30th of the following year," the agreement "shall be terminated." The inclusion of this language in the agreement reinforces that FWS is "authorized, but not required, to make' a certain decision and therefore possessed total discretion to act." *McCarthy*, 993 F.3d at 1255. Further, the provision in Section 5 of the Agreement that FWS can require CPW to make "appropriate changes" to its program in order to renew the

---

[5] While *Paulison* was decided on a challenge to the agency's failure to initiate consultation under Section 7 of the Endangered Species Act, the Tenth Circuit has observed that whether ESA consultation is required "has been interpreted similarly to the environmental analysis requirements under NEPA." *McCarthy*, 993 F.3d at 1253.

13

Agreement further underscores that FWS can impose terms or conditions on its decision, lending further support to the conclusion that the agency's decision was discretionary. *Id*.

Taken together, Section 5(b) of the Cooperative Agreement and 16 USC 1535(c)(1)(B) confirm that FWS retains discretion over whether and under what conditions to renew a cooperative agreement. Therefore, the Agency must comply with NEPA if its decision to renew the Agreement constitutes a major federal action significantly affecting the quality of the environment.

> ii.     FWS had *"actual power"* to control the project.

An agency has actual power to control a project such that NEPA is required if agency approval is a prerequisite to the activity or if the agency can exert binding influence on the activity. *Hodel*, 848 F.2d at 1089  (citing *Davis v. Morton*, 469 F.2d 593, 596–98 (10th Cir. 1972) (finding sufficient federal control to require NEPA where federal agency approval was required to commence a non-federal activity); *Scenic Rivers Ass'n v. Lynn*, 520 F.2d 240, 243–44 (10th Cir. 1975), *reversed on other grounds,* 426 U.S. 776 (1976) (finding sufficient federal control to require NEPA where the federal agency had the authority to "suspend a private action which would unquestionably affect the environment")). As discussed above, it is clear FWS had the authority to reject the renewal request or to require CPW to amend its program for the conservation of endangered species, which includes the state's plan to reintroduce wolves. *See* CPW, *Colorado Wolf Restoration and Management Plan* (May 3, 2023) ("Wolf Plan"). FWS, therefore, has the authority to exert binding influence on the renewal of the Agreement and on the contents of the Wolf Plan.

Additionally, ecause the 10(j) rule does not provide an independent source of legal authority for CPW to carry out the wolf introduction, *see* discussion *supra* on Redressability, FWS's renewal of the Agreement was a prerequisite for CPW to implement its planned reintroduction of gray wolves.[6] The planned reintroduction necessarily includes actions that constitute the prohibited "take" of endangered species, including but not limited to capturing, handling, and transporting gray wolves from locations outside Colorado and into the state, and is therefore generally unlawful under the ESA. Wolf Plan at 20; 16 U.S.C. § 1532(19). The limited waiver of the ESA's "take" prohibitions provided by the Agreement, however, authorizes CPW and its agents to "take any resident federally listed Endangered fish or wildlife for conservation purposes that are consistent with this Cooperative Agreement or any Project Agreement attached thereto." Agreement § 2(b); 16 U.S.C. § 1535(g)(2)(A). For the period of October 1, 2023 through September 30, 2024, CPW's program for the management of endangered species included CPW's newly created Wolf Plan, which allowed for the capture, handling, and transportation of gray wolves as necessary to implement the reintroduction. Therefore, the authority for CPW to reintroduce wolves in Colorado is granted by and anchored to the Agreement as renewed for the 2023–2024 period. Without the waiver of the ESA's take prohibition granted by the Agreement, CPW could not lawfully comply with federal law or C.R.S. § 33-2-105.8 and carry out its plan for the reintroduction of gray wolves. As discussed

---

[6] [6] Claims made by Conditional Intervenor Respondents that there are "multiple sources of independent authority" beyond the 10(j) rule to allow the state to release wolves are without merit and the Court does not address them further. Hearing Tr. (Rough) at 74:2–14 (Dec. 14, 2023).

above, the Cooperative Agreement provides CPW the only legal basis for carrying out the wolf

reintroduction. Its renewal is therefore a prerequisite to the reintroduction.

Other circuits have similarly held that NEPA is required where a federal agency's action

is a prerequisite to a nonfederal activity. In those cases, the courts have found that the agency

action is the "functional equivalent" of a permit, thereby triggering the requirements of NEPA.

*Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996). For example, the Ninth Circuit, in *Ramsey*

*v. Kantor*, held that promulgation of an incidental take statement under Section 7 of the ESA, 16

U.S.C. 1536, by the National Marine Fisheries Service[7] ("NMFS") was required to comply with

NEPA where it authorized an action that would have otherwise been unlawful and was thus the

functional equivalent of a permit. *Ramsey*, 96 F.3d at 437. At issue in *Ramsey* was whether the

NMFS was required to comply with NEPA prior to issuing an incidental take statement under

Section 7 of the ESA governing the permissible incidental take of endangered species of salmon

in the Columbia River area. *Id.* at 439. Prior to the issuance of this statement, salmon fishing in

the Columbia River would have been unlawful under the ESA because fishermen were unable to

differentiate non-endangered varietals of salmon from endangered ones, and any salmon fishing

would have necessarily resulted in the take of endangered species. *Id.*

Following the issuance of the incidental take statement, the states of Oregon and

Washington promulgated regulations governing salmon fishing in the Columbia River. *Id.* The

NMFS argued that "they did not authorize the harvesting of endangered salmon and thus claim . .

---

[7] The National Marine Fisheries Service shares responsibility with the U.S. Fish and Wildlife Service for administering the Endangered Species Act, with the former generally having authority over marine resources. 40 C.F.R. § 402.01(b).

. there was no major federal action in this case." *Id.* at 444. The Ninth Circuit disagreed, holding that "the incidental take statement . . . [was] functionally equivalent to a permit because the activity in question [the states' issuance of regulations on salmon fishing] would, for all practical purposes, be prohibited but for the incidental take statement." *Id.* at 444. The court reasoned that the federal regulations and its past cases clearly established that "if a permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute a major federal action and the federal agency involved must conduct an EA and possibly an EIS before granting it." *Id.*

Similarly, in *Sierra Club v. U.S. Army Corps of Engineers*, the D.C. Circuit Court of Appeals determined that the U.S. Army Corps of Engineers' ("Corps") incorporation of an incidental take statement was the functional equivalent of a permit and required NEPA review. *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 45 (D.C. Cir. 2015). There, the FWS had issued an incidental take statement following Section 7 consultation with the Corps regarding a pipeline project's impacts on endangered species in the area. *Id.* at 40. The Corps then implemented the incidental take statement as a condition of the Clean Water Act verifications issued to the pipeline owner. *Id.* at 44–45. The court determined that it was "only when the Corps formally incorporated the [incidental take statement] into its Clean Water Act verifications that it gave [the pipeline owner] permission to take species free from the threat of ESA liability." *Id.* at 46. Accordingly, the court concluded that the "Corps-implemented [incidental take statement] is the functional equivalent of a permit and thus constitutes federal action subject to NEPA." *Id.*

iii.     *Renewal of the Agreement upset the status quo.*

17

FWS next argues, citing *Living Rivers v. Hoffman*, 544 F. Supp. 3d 1218, 1223 (D. Utah 2021), that FWS's renewal of the Agreement was not a major federal action because the agency's renewal of the agreement merely maintained the status quo. U.S. Resp., ECF No. 17, at 5. This is because, according to FWS, the gray wolf has been included in the list of species managed by CPW since at least 2013. *Id.*

FWS's argument misses the point. CPW may have had authority under prior versions of the Agreement to manage transient wolves that happened to wander into the state, as has occurred occasionally in the last two decades. But in 2023, unlike previous years, CPW adopted its Wolf Plan, which establishes how the state agency will reintroduce and manage wolves in Colorado. Pursuant to Section 5(a) of the Agreement, CPW's request to renew the Agreement each year must include, among other things, "a list of any substantial changes in the Endangered and Threatened fish or wildlife conservation program since the date of the previous program submission." In this year's renewal request, CPW included a list of such changes, which included the adoption of the Wolf Plan in May 2023 and the state agency's plan to begin releasing wolves in Colorado in late 2023. Because the Wolf Plan was not approved until May 2023, it was not included in previous renewal requests made by CPW.

This "substantial change" in CPW's conservation programs is what transformed FWS's renewal of the Agreement in 2023 into a major federal action, and why renewal of the agreement this year did not maintain the status quo. Instead, it changed the status quo, and the agency should have prepared an environmental assessment and, if necessary, an environmental impact statement to examine the impacts of that change before renewing the Agreement incorporating the Wolf Plan.

*iv.     Failure to comply with NEPA was not harmless.*

The Conditional Intervenors argue that even if this Court finds FWS failed to comply with NEPA when it renewed the agreement, this error was harmless because FWS did analyze the impacts of wolf reintroduction in the FEIS it prepared for the 10(j) rule. Cons. Grp. Resp., ECF No. 23, at 8-9. Citing *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 74 (D.D.C. 2018), they argue that even if FWS improperly "segmented" its analysis, the Petitioners are not harmed because they fail to identify any concrete environmental impacts that were missed. *Id.*

This argument fails because the 10(j) FEIS expressly states it is not scoped to consider the full impacts of wolf reintroduction: "The State may reintroduce wolves with or without further action by FWS, in compliance with the State's cooperative agreement under section 6 of the ESA (see section 1.2); therefore, considering an alternative to not pursue active wolf reintroduction efforts is outside FWS's legal authority and outside the scope of the EIS." U.S. Fish and Wildlife Service, *Final Environmental Impact Statement, Colorado Gray Wolf 10(j) Rulemaking* at 1-5 (Sept. 2023) ("10(j) FEIS"). The 10(j) FEIS considered only three alternatives—reintroduction of gray wolves to Colorado without a 10(j) rule, reintroduction of gray wolves to Colorado with a 10(j) rule, and reintroduction of wolves to a portion of Colorado under a 10(j) rule. *Id.* at i-ii. It did not consider an alternative of no wolf reintroduction or compare the environmental impacts of wolf reintroduction to the conditions under a no-wolf baseline.

Considering alternative actions "is the heart of the environmental impact statement." 40 C.F.R. § 1502.14. While an agency is only required to consider "reasonable" alternatives, the agency may not define the objectives of a proposed action "so narrowly as to preclude a reasonable consideration of alternatives." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir.

2002). While the alternatives selected for the 10(j) FEIS were appropriate for the Agency's decision to adopt a 10(j) rule, a different standard applies to its decision to renew the Agreement. Here, FWS's discretion not to renew the Agreement with the Wolf Plan, or to require changes to the Wolf Plan before finding it acceptable under 16 U.S.C. § 1535(c)(1), mean FWS could and should have prepared an EIS for the renewal that considered a range of alternatives when weighing renewal, including a "no-reintroduction" no-action alternative and alternative management strategies to the Wolf Plan. Because it failed to do so, FWS cannot rely on the analysis in the 10(j) FEIS here.

### B. Irreparable Harm

NEPA's purpose is to influence the decision making process "by focusing the [federal] agency's attention on the environmental consequences of a proposed project," so as to "ensure[ ] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1219 (D. Colo. 2007) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). "The injury of increased risk of harm due to an agency's uninformed decision is precisely the type of injury the National Environmental Policy Act was designed to prevent." *Comm. To Save the Rio Hondo*, 102 F.3d at 448–49; *see also San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv.,* 657 F.Supp.2d 1233, 1241 (D. Colo. 2009) ("Plaintiffs' procedural interest in a proper NEPA analysis is likely to be irreparably harmed if [the agency] is permitted to go forward with the very actions that threaten the harm NEPA is intended to prevent, including uninformed decisionmaking.").While courts have found that these harms are, in part, environmental, the "primary injury" that results from allowing the agency's uninformed decision to proceed is "the difficulty of stopping a bureaucratic steam roller

once it is launched." *Colo. Wild*, 523 F. Supp. 2d at 1221 (internal quotation marks omitted); *see also Catron Cty. Bd. of Commissioners v. United States Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir.1996) (stating that this harm is environmental because "the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation by the action federal agency").

"[W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." *Colorado Wild Inc.*, 523 F. Supp. 2d at 1219 (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989)). Even where such harm is presumed, Petitioners "must still make a specific showing that the environmental harm results in irreparable injury to their specific environmental interests." *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016). Petitioners have done so here.

As demonstrated in the testimony before the Court by Stockgrower members Mr. Spann and Mr. Peterson, the reintroduction of wolves in the absence of adequate environmental review of the proposed gray wolf reintroduction will have serious impacts to their use and enjoyment of the land and resources in the Gunnison Basin, including their efforts in conserving the Gunnison Sage Grouse, and to their federally permitted grazing rights. Hearing Tr. (Rough) at 28:16-31:5, 40:1-46:14 (Dec. 14, 2023). Petitioner GCSA's members own property and reside in the Gunnison Valley, one of two wolf release areas identified in the Wolf Plan. Wolf Plan at 21-22. Although the exact extent of Petitioners' injuries is at this point uncertain, the fact that Petitioner Gunnison County Stockgrowers' Association's members reside in one of the State's wolf release

areas, coupled with size and scope of the wolf reintroduction effort and the variety of Petitioners' interests that will be impacted, supports a conclusion that their injury is significant. *See Davis*, 302 F.3d at 1115 (finding plaintiffs showed injury to their environmental interests by demonstrating that their property would be directly impacted by highway project, and in light of the "size and scope" of the project). Further, the precise extent of the injuries Petitioners will suffer from the agencies' uninformed actions on wolf reintroduction have not been fully determined precisely because the proposed action was not adequately analyzed under NEPA. This is "precisely the type of injury the National Environmental Policy Act was designed to prevent." *Comm. to Save the Rio Hondo*, 102 F.3d at 448–49.

Nor are these purely economic harms. Mr. Spann testified to his enjoyment of hunting and viewing wildlife on public lands near his home. Hearing Tr. (Rough) at 30:6-9 (Dec. 14, 2023). Mr. Peterson testified to the tremendous efforts the Stockgrowers have invested in conserving threatened Gunnison sage grouse and the disappointment he and others would feel were these efforts threatened either directly or indirectly by wolves. *Id*. at 41:13-43:19. Harms to these interests are real and tangible and would not be compensable by a later award of money damages. *Cf. Comm' to Save the Rio Hondo*, 102 F.3d at 450 (finding allegations that summertime use of ski area would degrade water quality in river and impair the plaintiffs' recreational and aesthetic interests in the land around the ski area were sufficient to establish harm).

i.      *Introduction of wolves will irrevocably alter the status quo.*

CPW argues that release of wolves in the first year of the reintroduction program will not irrevocably alter the status quo and cause irreparable injury because the release will consist of

only 10-15 wolves, which will be equipped with radio collars, enabling them to be tracked and, if necessary, recaptured. State Resp., ECF No. 19, at 9. This argument disregards Tenth Circuit precedent establishing that "proof of imminent, tangible physical injury to the environment" is not required to establish irreparable injury in the NEPA context. *Colo. Wild*, 523 F. Supp. 2d at 1221 n.5 (citing *Davis*, 302 F.3d at 1114-15).

In *Davis*, the Tenth Circuit considered whether the plaintiffs would suffer irreparable harm if the first phase of a construction project was allowed to proceed absent NEPA review where the "on the ground environmental harms" asserted by the plaintiffs would not arise until the third phase of the project. The reviewing court found the plaintiffs had established irreparable harm under NEPA sufficient to enjoin the first phase of the project, reasoning that "[i]f construction goes forward on Phase I, or indeed if any construction is permitted on the Project before the environmental analysis is complete, a serious risk arises that the analysis of alternatives required by NEPA will be skewed toward completion of the entire Project." *Davis*, 302 F.3d at 1115 & n.7.

Here, release of wolves poses a similar risk: if CPW is allowed to begin release of wolves, any future NEPA analysis will be skewed towards alternatives that continue the reintroduction. CPW says it will release "only" 10 to 15 wolves, but that is in the first year of the reintroduction program. If CPW is not enjoined, releases will continue, and the number of wolves will rapidly increase. Even the first 10 to 15 wolves will be released in areas far from any existing wolves in Colorado, much closer to Petitioners' members than the few wolves already present in the far north of the state. This greatly increases the likelihood wolves soon arrive in areas where Petitioners' members work and recreate, causing them injury. Therefore, the fact

that CPW plans to release a relatively small number of wolves in the first year does not establish that Petitioners will not suffer irreparable injury if release of wolves is not enjoined.

ii.    *Petitioners did not unduly delay in bringing their claim.*

FWS argues Petitioners have been aware of wolf reintroduction since Proposition 114 passed in 2020 and could have challenged prior renewals of the Section 6 agreement that occurred since Prop 114, in 2021 and 2022. U.S. Resp., ECF No. 17, at 8. The agency also argues that plaintiffs have been aware of the renewal of the cooperative Agreement this year since November 20, and yet waited three weeks to file its complaint. *Id.* FWS argues these facts show the Petitioners unduly delayed filing and urges the court to find Petitioners' delay cuts against a finding of irreparable injury. *Id.* at 107 (citing *RoDa Drilling Co.*, 552 F.3d at 1211).

The passage of Proposition 114 is common knowledge in Colorado, but contrary to the agency's assertions, Petitioners could not have challenged renewal of the Section 6 Agreement related to wolf reintroduction until this year, when CPW developed the Wolf Plan and submitted its request for renewal of the Section 6 Agreement with that plan as part of its program for management of endangered species. Prior to this occurrence, the State's Wolf Plan was not part of CPW's endangered species management programs, and a challenge to the renewal of the Agreement was not warranted.

When CPW submitted its renewal request this year, GCSA sent two letters to USFWS officials in September and October requesting that they comply with NEPA before renewing the Agreement. Compl. Para. 55. However, Plaintiffs' claim regarding renewal of the agreement was not ripe until FWS actually renewed the Agreement and failed to comply with NEPA. FWS did not renew the agreement until November 20, 2023.

Even if Plaintiffs learned about the renewal on November 20, their decision to file their lawsuit some three weeks later does not constitute undue delay. Preparing and filing a complaint takes time to, among other things, conduct legal research and obtain client approval. Under these circumstances, that plaintiffs filed their complaint only three weeks after the Agreement was renewed is not unreasonable under the circumstances. This does not constitute undue delay, and this Court will not presume the brief window between renewal of the Agreement and the filing of this lawsuit weighs against a finding of irreparable injury, particularly since the actual cause of injury—release of wolves without the benefit of a NEPA analysis to inform the release—has not yet occurred.

### C.  *Balance of Equities and the Public Interest*

Petitioners have shown that their threatened injury outweighs the injury to the other parties and an injunction is in the public interest. *See Barrington v. United Airlines, Inc.*, 566 F.Supp.3d 1102, 1113–14 (D. Colo. 2021). These factors "merge when the Government is the opposing party." *Denver Homeless Out Loud v. Denver, Colo.*, 32 F.4th 1259, 1278 (10th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Unlike the irreparable harms faced by Petitioners, any harms faced by Respondents are purely financial or speculative. FWS does not even allege that it will face any harms should the injunction issue. See U.S. Resp., ECF No. 17, at 9. Rather, FWS mischaracterizes the result of the injunctive relief sought here. *Id*. at 9–10. By its terms, if the Cooperative Agreement is not renewed, the previous version of the Agreement, in this case the agreement for the period of October 1, 2022 through September 30, 2023, would remain in place until June 30, 2024. Cooperative Agreement at § 5(b); Mot., Ex. A, ECF No. 1-1, at 9. Thus, there would be no

"sledgehammer to the conservation of endangered and threatened species in Colorado" as FWS alleges. U.S. Resp., ECF No. 17, at 9. Further, This Court can issue an order staying agency action on the Section 6 Agreement only as regards the gray wolf.

CPW, in its response to Petitioners' Motion, claims that if wolf reintroduction is delayed, its only certain harm will be the loss of the money that has been spent arranging for the capture and transport of wolves from Oregon. State Resp., ECF No. 19, at 10. CPW further argues that if reintroduction is delayed beyond the statutory deadline of December 31, 2023, CPW could be exposed to liability, and the public interest, as represented by the will of the voters, would not be served. *Id.* The two sides present different interpretations of the statutory deadline regarding wolf reintroduction that are both, as CPW states, "untested." Mot. at 21; State Resp., ECF No. 19, at 10. It is unnecessary for the court to resolve this dispute, as this court is empowered to enjoin action that violates federal law even if doing so might conflict with a state law. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) (recognizing the *Ex Parte Young* doctrine empowers federal courts to enjoin state officials from enforcing state laws that are contrary to federal law).

In addition, the public interest is not well represented in this instance by the will of the voters. Proposition 114 passed narrowly, with 50.91% in favor and 49.09% against, with the counties voting in its favor primarily located in the eastern portion of the state where wolves will not be released. Given that public opinion on Proposition 114 was largely divided and that there is clear 10th Circuit precedent identifying the "strong public interest in the enforcement of NEPA," *Coal. of Concerned Citizens*, 843 F.3d at 915, enjoining CPW from beginning reintroduction absent adequate NEPA review is still in the public interest.

Accordingly, Petitioners have shown that their threatened injury outweighs the financial and speculative injury to CPW, and an injunction is in the public interest.

### D. Bond

Rule 65(c) provides that a successful applicant for a preliminary injunction post a bond or other security "in such sum as the court deems proper" for the payment of costs and damages that may be incurred by a party who is wrongfully enjoined. Fed. R. Civ. P. 65(c). However, "the trial judge has wide discretion in the matter of requiring security" and under some circumstances, "no bond is necessary." *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964). Here, Petitioners are two non-profit groups seeking to enforce the requirements of NEPA to protect their rights and interests and to advance the public's interest in informed environmental decision making. Imposition of a bond requirement in this case would preclude Petitioners' ability to enforce their claims and frustrate the policies underlying NEPA and the APA. *See e.g., Colorado Wild*, 523 F.Supp.2d at 1230–31 (requiring no bond for plaintiffs bringing claims to enforce NEPA). Accordingly, Petitioners' are not required to post a bond in this case.

1. Upon finding that Petitioners have met their burden of showing a likelihood of success on the merits, a likelihood of suffering irreparable harm without the injunctive relief, that the balance of equities is in Plaintiffs' favor, and the injunctive relief is in the public interest, the Court herby GRANTS Petitioners Motion for Stay of Agency Action, Preliminary Injunction and Temporary Restraining Order.

2. Respondents Colorado Division of Parks and Wildlife, Jeff Davis, Eric Odell, and Colorado Parks and Wildlife Commission, and all their respective officers, agents, employees, and persons acting in concert or participation with them are hereby ENJOINED from releasing, or authorizing, allowing, or in any way facilitating the release of, gray wolves into the State of Colorado.

3. The decision by Respondents FWS and Martha Williams to renew the Cooperative Agreement is hereby STAYED pursuant to 5 U.S.C. § 705.

4. This order shall take effect immediately and shall remain in effect until further order of this court.


IT IS SO ORDERED.

Date: _____

_____
Honorable Judge Regina M. Rodriguez