IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez

Civil Action No. 1:23-cv-3258

GUNNISON COUNTY STOCKGROWERS' ASSOCIATION, INC., a Colorado Nonprofit Corporation; and
COLORADO CATTLEMEN'S ASSOCIATION, a Colorado Nonprofit Corporation

 Petitioners,

v.

U.S. FISH AND WILDLIFE SERVICE;
MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife Service;
COLORADO DIVISION OF PARKS AND WILDLIFE;
JEFF DAVIS, in his official capacity as Director of Colorado Parks and Wildlife;
ERIC ODELL, in his official capacity as Wolf Conservation Program Manager for Colorado Division of Parks and Wildlife; and
COLORADO PARKS AND WILDLIFE COMMISION,

 Respondents.

## ORDER

  The reintroduction of the gray wolf in Colorado has been a matter of controversy for a number of years, with valid interests and concerns raised on each side of the equation. In November of 2020, the voters passed a measure to allow the reintroduction of gray wolves in Colorado. The reintroduction is set by statute to begin by December 31, 2023. On the eve of the reintroduction, Petitioners filed the instant suit asking this Court to enjoin this reintroduction. ECF No. 1.

Pending now before the Court is Petitioners' Verified Motion for Stay of Agency Action, Preliminary Injunction and Temporary Restraining Order and Memorandum in Support ("Motion for TRO"), ECF No. 5. The U.S. Fish and Wildlife Service and Martha Williams (the "Federal Respondents" or "FWS") filed a Response, ECF No. 17. The Colorado Division of Parks and Wildlife, Jeff Davis, Eric Odell, and Colorado Parks and Wildlife Commission (the "State Respondents" or "CPW") also filed a Response, ECF No. 19. The Court held a hearing on the Motion for TRO on December 14, 2023.

Having considered the arguments set forth by the parties, the Court finds that, while the Petitioners who have lived and worked on the land for many years are understandably concerned about possible impacts of this reintroduction, neither these possible impacts nor their assertions under the Administrative Procedures Act are sufficient for this Court to grant the extraordinary relief they seek. For the reasons set forth below, the Petitioners' Motion for TRO is **DENIED**.

## I.   BACKGROUND

In November 2020, Colorado voters approved Proposition 114, a ballot measure requiring CPW to restore gray wolves to the state. The measure, codified at C.R.S. § 33-2-105.8, recognized that "wolves were an essential part of the wild habitat of Colorado" before their extermination, and that, once restored, "gray wolves will help restore a critical balance in nature." *Id.* § 33-2-105.8(1)(a) and (c). It also requires the Colorado Parks and Wildlife Commission to "[d]evelop a plan to restore and manage gray wolves in Colorado" and "[t]ake the steps necessary to begin reintroductions of gray wolves by December 31, 2023." C.R.S. §§ 33-2-105.8(2)(a), (d). Consistent with the statute, the Colorado Parks

and Wildlife Commission developed and finalized a plan for reintroduction—which was unanimously approved by CPW on May 3, 2023 (the "Plan"). *See* CPW, Colorado Wolf Restoration and Management Plan (May 3, 2023). The Plan includes the transfer of thirty to fifty wolves over a three-to-five-year period onto private and state-owned land in two geographic areas in Colorado beginning in 2023. CPW represents that the collection of the wolves will begin on or about December 17, 2023.

CPW and the FWS had already been parties to a Cooperative Agreement pursuant to section 6(c) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1535(c). ECF No. 1 at 9. The Cooperative Agreement requires renewal each year providing the State program is in compliance. Colorado's Cooperative Agreement has been renewed every year since 1976. *Id.* Section 6(c) of the ESA provides:

> In furtherance of the purposes of this chapter, the Secretary is authorized to enter into a cooperative agreement in accordance with this section with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species. Within one hundred and twenty days after the Secretary receives a certified copy of such a proposed State program, he shall make a determination whether such program is in accordance with this chapter. Unless he determines, pursuant to this paragraph, that the State program is not in accordance with this chapter, he shall enter into a cooperative agreement with the State for the purpose of assisting in implementation of the State program. In order for a State program to be deemed an adequate and active program for the conservation of endangered species and threatened species, the Secretary must find, and annually thereafter reconfirm such finding, that under the State program . . . .

16 U.S.C. § 1535(c). The section goes on to identify the specific findings the Secretary must make for a program to be deemed "adequate and active." *Id.* Those findings are: (a) authority resides in the State agency to conserve resident species of fish or wildlife determined by the State agency or the Secretary to be

3

endangered or threatened; (b) the State agency has established acceptable conservation programs, consistent with the purposes and policies of this chapter, for all resident species of fish or wildlife in the State which are deemed by the Secretary to be endangered or threatened, and has furnished a copy of such plan and program together with all pertinent details, information, and data requested to the Secretary; (c) the State agency is authorized to conduct investigations to determine the status and requirements for survival of resident species of fish and wildlife; (d) the State agency is authorized to establish programs, including the acquisition of land or aquatic habitat or interests therein, for the conservation of resident endangered or threatened species of fish or wildlife; and (e) provision is made for public participation in designating resident species of fish or wildlife as endangered or threatened. *Id.*

It is Section 5(a) of the Cooperative Agreement that requires CPW to annually request that the agreement be renewed for the upcoming period. ECF No. 1 at 5. CPW must submit certain supporting documents with the request, including a list of any substantial changes in the endangered and threatened wildlife conservation program since the date of the previous program submission. *Id.* Accordingly, on October 17, 2023, CPW sent FWS a letter requesting renewal of the Cooperative Agreement. *Id.* at 12. CWS attached the list of substantial changes to the program, which included the submission of the planned reintroduction and management of gray wolves. *Id.* In November 2023, FWS found that the program was adequate and active and therefore approved the request to

renew the Cooperative Agreement. *Id.* at 12. The FWS did not complete any analysis under the National Environmental Policy Act ("NEPA") in approving the renewals of the Cooperative Agreement. In fact, during the hearing, all parties acknowledged that FWS has never completed an analysis under NEPA for any of the past renewals or for any cooperative agreements that FWS has in Colorado or any of the other 49 states.

NEPA, 42 U.S.C. §§ 4321 *et seq.*, was enacted to ensure fully informed decision making prior to approval and implementation of actions affecting the quality of the human environment and to provide for public participation in such decision making. 40 C.F.R. § 1500.1(a). The Council on Environmental Quality promulgates regulations implementing NEPA that are binding on all federal agencies. 40 C.F.R. § 1500.3(a). NEPA requires an Environmental Impact Statement ("EIS") to be prepared for all "major Federal actions significantly affecting the quality of the human environment. . . ." 42 U.S.C. § 4332(2)(C). For proposed actions where the environmental effects are uncertain, the agency must prepare an Environmental Assessment. 40 C.F.R. § 1501.5. Major federal action means "an activity or decision subject to Federal control and responsibility" that is discretionary and results in final agency action. 40 C.F.R. §§ 1508.1(q)(1)(ii), (iii). A non-federal project may be a major federal action subject to the requirements of NEPA where a federal agency exercises "sufficient control and responsibility" over the project. 40 C.F.R. § 1508.1(q)(1)(vi).

In support of its efforts to reintroduce wolves, CPW asked FWS to promulgate a rule under Section 10(j) of the ESA establishing a non-essential, experimental population of gray wolves in Colorado. FWS did engage in the NEPA process in promulgating the proposed rule. FWS's NEPA process included extensive public involvement: the agency conducted a public scoping process—to identify the important issues for its analysis—from July 21, 2022 to August 22, 2022, followed by a public- and peer-review comment process in early 2023, and issuance of a proposed rule and additional public comment on February 17, 2023. *Id.* at 77,034. FWS then issued its Final Environmental Impact Statement for the 10(j) Rule ("10(j) FEIS") in September 2023. *See* U.S. Fish & Wildlife Serv., *Final Environmental Impact Statement - Colorado gray wolf 10(j)* (Sept. 2023). On November 8, 2023, the FWS published the final rule, which became effective December 8, 2023. *Id.* Petitioners did not, at the time and do not now, challenge the 10(j) Rule or the 10(j) EIS.

Petitioners filed this action on December 11, 2023—over 3 years after the ballot measure passed, and just weeks before the statutory deadline for Colorado to begin wolf releases—wherein they assert only one claim: that Respondents violated NEPA when they renewed a Cooperative Agreement issued under Section 6 of the ESA without conducting an EIS. ECF No. 1. Six nonprofit organizations with interest in Colorado's wolf restoration effort also moved to intervene as respondents in this suit. ECF Nos. 14, 18, 22.

6

On December 12, 2023, Petitioners filed the motion for injunctive relief now before the Court. ECF No. 5. Petitioners ask the Court to: (1) issue a preliminary injunction and TRO enjoining the State Respondents from releasing or authorizing the release of any gray wolves in Colorado and (2) stay the decision by the FWS to renew the Cooperative Agreement pending resolution of this case. ECF No. 5. The parties briefed the motion, and the Court held an evidentiary hearing and heard argument on December 14, 2023.

## II.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (quoting *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989)).

> To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.

*Aposhian*, 958 F.3d at 978 (quoting *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007)); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). "It is the movant's burden to establish that each of these four factors tips in his or her favor." *Heideman*, 348 F.3d at 1188–89. Additionally, any relief granted in a preliminary injunction must be "of the same character as that which may be finally

granted." *Stouffer v. Eulberg*, No. 09-cv-00320, 2010 WL 567998, at *2 (W.D. Okla. Feb. 11, 2010) (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)).

### III.   ANALYSIS

#### A.   Substantial Likelihood of Success on the Merits

Petitioners must demonstrate a substantial likelihood of success on the merits of their claim. Petitioners fail to meet that burden for two reasons. First, Petitioners are unlikely to succeed on their claim that FWS failed to comply with NEPA when it renewed its Section 6(c) Cooperative Agreement with CPW. Second, even if Petitioners were to succeed on that claim, they have not shown they are entitled to an injunction preventing CPW from complying with C.R.S. § 33-2-105.8(2)(d), which requires the State to "[t]ake the steps necessary to begin reintroductions of gray wolves by December 31, 2023…".

##### 1.   NEPA Compliance

In order for Petitioners to succeed on their sole claim that FWS failed to comply with NEPA when it renewed its Section 6(c) Cooperative Agreement with CPW, the parties agree Petitioners would need to demonstrate the decision by FWS was discretionary. ECF No. 5 at; ECF No. 17 at 3. The dispute centers around whether the decision at issue was in fact discretionary as argued by Petitioners or non-discretionary as argued by Respondents.

Section 6(c) provides that the Secretary of the Interior, here acting through FWS, "**shall** enter into a cooperative agreement with the State" unless FWS determines that the State's conservation plan is not adequate and active. 16 U.S.C. § 1535(c)(1) (emphasis added). The word "shall" implies a mandatory duty, without room for discretion. *See Nat.*

8

*Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1252-53 (10th Cir. 2021). Section 6(c) also identifies five criteria that FWS must consider when determining whether a cooperative agreement is "active and adequate." *See* 16 U.S.C. § 1535(c)(1)(A)-(E).

Petitioners concede the use of the term "shall" in the statute appears to be mandatory, but argue that under *McCarthy*, "even seemingly mandatory language in a statute can still leave an agency with considerable discretion." Petitioners are correct that the Tenth Circuit in *McCarthy* noted that "'even mandatory actions . . . [may] be discretionary . . . when the statutory criteria are so open-ended that they leave the agency significant flexibility on *when* or *how* to act.'" *Id*. at 1253 (quoting *Nat'l Wildlife Fed'n v. Sec'y of the U.S. Dep't of Transp.*, 960 F.3d 872, 876 (6th Cir. 2020) (alterations in original)). However, the Tenth Circuit also reasoned that "[i]f an agency is required by law to take a certain action once specified triggering events have occurred, the action is not discretionary, even though the agency may exercise some judgment in determining whether the triggering events have occurred." *Nat. Res. Def. Council,* 993 F.3d at 1253 (10th Cir. 2021) (internal quotations and citations omitted). The key is whether the criteria the agency must consider are broad enough that the agency exercises discretion as opposed to judgment when determining whether the criteria are met. *Id. See also Nat'l Wildlife Fed'n v. Sec'y of the United States Dep't of Transportation,* 960 F.3d 872, 874 (6th Cir. 2020) ("Discretion and judgment are not the same thing.")

Whether the decision to renew a Section 6(c) Cooperative Agreement is discretionary and therefore requires compliance with NEPA is an issue of first impression. However, the Tenth Circuit's decision in *McCarthy* is instructive here. In *McCarthy*, a

9

regulation provided that when a Bureau of Land Management ("BLM") officer determines that off-road vehicles are causing or will cause considerable adverse effects to certain areas, he or she "shall immediately close the areas . . . until the adverse effects are eliminated and measures implemented to prevent recurrence. *Id.* at 1252 (quoting 43 C.F.R. § 8341.2(a)). The Plaintiffs in *McCarthy* argued that the decision to lift the temporary closure was a discretionary decision requiring environmental analysis under NEPA. *Id.* at 1251. The Plaintiffs argued that, even though the regulation used the word "shall," the BLM's determination that "the adverse effects are eliminated and measures implemented to prevent recurrence" was discretionary. *Id.* at 1251. The Tenth Circuit concluded that the BLM's determination triggering the lifting of the temporary closure order was non-discretionary. *Id.* In reaching this conclusion, the Tenth Circuit reasoned that "the BLM's determination of whether 'the adverse effects are eliminated and measures implemented to prevent recurrence' more closely resembles judgment than it does discretion. Accordingly, when that determination is made, the BLM need not conduct environmental analysis before lifting a temporary closure order." *Id.* at 1253.

Applying the Tenth Circuit's reasoning here, the Court finds it likely that FWS's determination triggering the renewal of the Cooperation Agreement was non-discretionary. As noted above, there are five Section 6(c) criteria that FWS must consider when determining whether a cooperative agreement is "active and adequate." Petitioners concede that four of the five criteria are non-discretionary. *See* ECF No. 29-1 at 12. But they argue that the criteria at Section 1535(c)(1)(B), which requires that FWS to determine that "the State agency has established acceptable conservation programs, consistent with

10

the purposes and policies of this chapter, for all resident species of fish or wildlife in the State which are deemed by the Secretary to be endangered or threatened, and has furnished a copy of such plan and program together with all pertinent details, information, and data requested to the Secretary" is discretionary. *Id.* at 13-14. But, like the Tenth Circuit in *McCarthy*, the Court finds that FWS's determination as to whether the criteria at Section 1535(c)(1)(B) is met more closely resembles judgment than it does discretion.

Section 1535(c)(1)(B) involves the judgment of FWS as to whether the State agency's conservation programs are acceptable and consistent with the purposes and policies of the ESA. Petitioners focus on the word "acceptable," insisting that this gives the agency considerable discretion to determine what is necessary for a state conservation program to be acceptable. ECF No. 29-1 at 12. But what is "acceptable" is not open-ended. FWS must determine what is "acceptable and consistent with the purposes and policies of the ESA." Section 1535(c)(1)(B). Although this is not an entirely mechanical action, the FWS is directed to consider the existing purposes and policies of the ESA and, if the plan aligns, it is deemed acceptable. As the Tenth Circuit reasoned, "agency action need not be 'entirely mechanical' for the agency to still be exercising only 'judgment,' not 'discretion.'" *McCarthy*, 999 F.3d at 1252 (quoting *National Wildlife Federation v. Secretary of the United States Department of Transportation*, 960 F.3d 872, 876 (6th Cir. 2020)).

Further, the Sixth and Ninth Circuits have considered statutes that provide that an agency "shall" approve a plan as long as certain enumerated criteria are met and determined that the fact the agency must evaluate the enumerated criteria does not make

11

the agency's action discretionary. *See, e.g.*, *National Wildlife Federation*, 960 F.3d at 877 (agency's approval of oil pipeline's response plan under the Clean Water Act was non-discretionary even though agency had to determine if plan met six enumerated statutory criteria to address the risk of a potential oil spill and the statutory criteria incorporated environmental concerns); *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1224 (9th Cir. 2015) (the fact that an agency has to exercise some subjective judgment to decide whether relevant criteria are met is not sufficient to "defeat an agency's nondiscretionary statutory directive.").

Given the Tenth Circuit precedent and the persuasive authority from other circuits, it is unlikely that Petitioners would succeed in showing that FWS's decision to renew the Cooperation Agreement under Section 6(c) of the ESA is discretionary. Thus, the Court concludes that Petitioners are unlikely to succeed on their claim that the FWS failed to comply with NEPA when it renewed its Section 6(c) Cooperative Agreement with CPW.

### 2. Redressability

Even if Petitioners were to succeed on their claim that FWS failed to comply with NEPA when it renewed its Section 6(c) Cooperative Agreement with CPW, it is not clear that Petitioners' ultimate injury—that caused by the reintroduction of wolves—would be redressed. That is because the 10(j) rule may very well provide authority, independent of Section 6, for CPW to proceed with its Plan to reintroduce the gray wolf in Colorado.

Notably, Petitioners have not challenged Rule 10(j). The 10(j) rule recognizes that "CPW officials plan to capture wild gray wolves in cooperating States in the Western United States where wolves are federally delisted (Montana, Idaho, Wyoming, and the

12

eastern third of Washington and Oregon, and north-central Utah).” 88 Fed. Reg. at 77022. After capturing the wolves, CPW plans to transport them to Colorado, *see id.*, where FWS has established a nonessential experimental population. *See id.* at 77021. CPW does not need the Service's authorization to capture and transport wolves from an area where they are federally delisted to Colorado. Once in Colorado, where wolves are federally listed, CPW needs authority from the FWS to "take" them under the ESA. The FWS's 10(j) rule authorizes CPW to do just that. Specifically, the rule provides that, "[w]hen acting in the course of official duties, any employee of the service or a designated agent may take a wolf, when necessary, in regard to the release, tracking, monitoring, recapture, and management of the [nonessential experimental population the rule establishes]." 88 Fed. Reg. at 77038. CPW is a "designated agent," ECF No. 19-1, and is therefore authorized to take wolves "in regard to the release" in Colorado.

Ultimately, it is not clear Petitioners could succeed on their request for a permanent injunction prohibiting CPW from releasing wolves into Colorado until the FWS complies with NEPA because FWS's 10(j) Rule, which Petitioners do not challenge here, appears to independently authorize reintroduction activities. Put another way, a decision staying or setting aside the Cooperative Agreement likely will not address the ultimate injuries Plaintiffs raise and therefore creates an Article III redressability problem. *See Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011) (A federal court may not resolve questions in the abstract, but instead may only resolve "disputes arising out of specific facts when the resolution of the dispute will have practical consequences to the conduct of the parties."); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–

61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("It must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (quotations omitted).

For these reasons, Plaintiffs have not shown a substantial likelihood of success on the merits of their claim.

B.   **Irreparable Harm**

After establishing that there is a "substantial likelihood of success on the merits" of his claims, a movant for a preliminary injunction must also show that he will suffer "irreparable harm . . . if the injunction is denied." See Aposhian, 958 F.3d at 978. The "irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Schrier v. Univ. Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). A mere "possibility of irreparable harm" is not enough. See id. Economic loss does not typically constitute irreparable harm, as economic loss is fully compensable after the fact by money damages. *N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017). To satisfy its burden of proving irreparable harm, the party seeking injunctive relief must show that the harm is "certain and great" and not speculative. *Id.*

Here, Petitioners have not presented evidence demonstrating that harm will occur if their requested relief is not granted, nor have they demonstrated such harm, if it did occur, would be irreparable. First, the Petitioners' concerns regarding potential harm to livestock and to Gunnison sage-grouse are too speculative to support a finding of

14

irreparable harm. With respect to the sage-grouse, Petitioners' members presented evidence that they support conservation efforts for this species. *See, e.g.*, ECF 5-6 (Trampe Decl.). In addition, witnesses testified at the hearing that they have a concern for this species and wish to see the sage-grouse do well. The witnesses stated they worried that due to the anticipated presence of wolves on their federal grazing allotments, their grazing permits might not be renewed, and testified that they believed recreational uses on federal lands – hunting in particular – could be impacted. While neither of Petitioners' witnesses have scientific expertise or specialized knowledge of the species, they have lived and worked on the land for decades. But even their observations were based upon beliefs of what may happen or speculation. Thus, their testimony did not point to any "certain, imminent, and serious" harm. *New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1251 (10th Cir. 2017) (denying preliminary injunction due to the plaintiff's failure to identify or address the "type, likelihood, imminence, or degree of harm" that release of wolves would have on the state's ungulate species and speculative assertions that increasing the population of wolves "has the potential to affect predator-prey dynamics . . . ."). The EIS conducted for the 10(j) Rule was uncontested. That agency finding was that the presence of wolves will not have an impact on sage-grouse. ECF No. 19 at 8; *see Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1060 (10th Cir. 2014) ("Our deferential review [of agency action] 'is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.'" (quoting *Utah Env't Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008)).

With respect to livestock losses, the Court finds that these claims of potential harm are speculative as well. At the hearing, Petitioners' witnesses described their concerns regarding livestock losses as "worries" about what "might" happen to their livestock. The record before the Court does not substantiate a likelihood of imminent livestock losses, particularly in the context of a request for emergency relief. Data submitted to the Court by the Conservation Groups, and not rebutted by Petitioners, demonstrate that in other states with hundreds or thousands of wolves, predation affects mere fractions of a percent of total livestock populations. E.g., ECF No. 22-1; ECF No. 14-1 at 005.

Moreover, the impending releases that Petitioners seek to enjoin on an emergency basis would involve a small number of wolves. Counsel for the State Respondents stated at the hearing that the initial release would include fewer than 10, and likely only 5, animals. Additionally, any wolves released by CPW as part of the wolf reintroduction will have tracking collars on them, 88 Fed. Reg. at 77022; Wolf Plan at 20, so they can be located and recaptured if subsequently required by the Court. And whether the initial, small group of wolves to be released will make their way to the areas Petitioners are concerned about and cause the effects Petitioners fear is far from imminent or certain. Finally, Petitioners' witnesses testified as to worries regarding their ability to renew their grazing leases after wolf reintroduction, but they provided no concrete reason to suspect this may occur. On this record, the Court concludes that Petitioners have failed to show a likelihood of livestock losses warranting emergency relief.

The Court also finds that potential losses to livestock are primarily economic losses that are compensable with money damages. Indeed, CPW is required under state law to

pay "fair compensation to owners of livestock for any losses of livestock caused by gray wolves." Colo. Rev. Stat. § 33-2-105.8(2)(e)(2). CPW is offering compensation up to $15,000 per animal for livestock losses. 2 Colo. Code Regs. 406-17:17162.A.2. Although the Court does not discount the significance of these economic losses, were they to occur, they are compensable with money damages and thus cannot suffice to support a showing of irreparable harm. *N.M. Dep't of Game & Fish*, 854 F.3d at 1250; *see also Coalition*, 2004 WL 7337667, at *22 (finding state's wolf compensation plan and other mitigation measure were "sufficient to preclude a showing of the type of risk of irreparable harm necessary to warrant preliminary injunctive relief").

For these reasons, the Court finds Petitioners' claims of imminent, irreparable harm are too speculative to support an injunction.

### C.    Balance of the Harms

"To obtain a preliminary injunction, the movant must [also] show [that] . . . the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party." *Aposhian*, 958 F.3d at 978.

Harm befalls the public "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)); *see also, e.g., Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 812 (D. Or. 2022) (finding state's interest "particularly strong" where challenged measure "was enacted directly by a majority of Oregon voters"). The Court finds that this form of substantial harm applies here, where the law in question was approved by the majority of

17

Colorado voters. Additionally, Petitioners' injunction to prevent the reintroduction of wolves would thus prevent CPW from effectuating its statutory mandate to reintroduce wolves before the end of 2023, exposing it to potential liability.

Moreover, in line with the expressed interest of the public, CPW has spent years preparing to reintroduce wolves into Colorado. CPW has devoted substantial public resources to this effort, and presented evidence that some of those would be lost if it were forced to delay its efforts.

### D.     Public Interest

The final requirement for a movant to obtain a preliminary injunction is to show that "the injunction, if issued, will not adversely affect the public interest." *Aposhian*, 958 F.3d at 978. The injunctive relief Petitioners request is contrary to the public's interest in seeing gray wolves released in Colorado. As described above, voters passed Proposition 114 in 2020, which required the State to take steps to begin the reintroduction of gray wolves by December 31, 2023. See C.R.S. § 33-2-105.8. Petitioners now ask the Court to halt the release of wolves and enjoin CPW from carrying out the will of Colorado voters. Doing so would be contrary to the public interest.

### IV.     CONCLUSION

For the reasons stated above, the Court DENIES Petitioners' Motion for TRO, ECF No. 5.

DATED: December 15, 2023

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge

19